RONALD W. MCCRARY AND DIANE E. MCCRARY,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 2979-86.          Filed April 17, 1989.

*Gary R. DeFrang, Joseph Wetzel,* and *Russell A. Sandor,* for the petitioners.

*Kathleen O. Lier* and *Mary Beth V. Calkins,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies in and additions to petitioners' Federal income taxes for 1982 and 1983 as follows:

| | | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) [1] | Sec. 6653(a)(2) | Sec. 6621(d) | Sec. 6659 |
| 1982 | $19,758.43 | $987.92 | * | *** | $5,550 |
| 1983 | 597.08 | 1,119.88 | ** | - - - | - - - |

\* 50 percent of the interest due on $19,758.43.
\*\* 50 percent of the interest due on $597.08.
\*\*\* To be determined.

Respondent also determined that the entire underpayment for 1982 was a tax-motivated transaction under section 6621(c), formerly section 6621(d), and respondent claimed an

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.

addition to tax under section 6661 as an alternative to the addition to tax under section 6659. The issues for decision are whether petitioners are entitled to any deductions arising out of a master recording transaction with American Educational Leasing (AEL) and whether petitioners are liable for any of the additions to tax or for the additional interest under section 6621(c). Respondent and numerous other taxpayers who claimed deductions and investment tax credit arising out of the AEL master recording leasing program have agreed to be bound by the results in this case.

## FINDINGS OF FACT

Petitioners were residents of Houston, Texas, at the time they filed their petition herein. They filed joint Federal income tax returns for the years in issue.

Petitioner Ronald W. McCrary (petitioner) graduated from college with majors in business and economics. After graduation from college and through 1982, petitioner was involved primarily in commercial lending and bank management. During 1982, he was a vice president and commercial loan officer at Cullen Bank in Houston, Texas.

During 1982, petitioner was involved in loan transactions, proposing loans for approval, and acting as a member of Cullen Bank's loan committee. In reviewing loans, petitioner considered the perceived degree of risk, which was determined based upon the loan request, the collateral, and the repayment schedule. In evaluating the proposed collateral, petitioner considered the fair market value of the property and the price paid for the property.

Prior to 1982, petitioners owned and listened to musical and educational tapes. They owned four or five cassette tape players, located in their bedrooms, den, and automobiles. They had no experience in distributing records or tapes.

In November 1982, petitioner was provided information concerning the AEL master recording lease program by Rex Tindall, an AEL representative. He received from Tindall various materials, including a red, white, and blue brochure, covered with stars and stripes, entitled "American Educa-

tional Leasing Investment Leasing Program." The brochure summarized the purported benefits of the program as follows:

## A VERY UNIQUE OPPORTUNITY
### with tax benefits to you

* Limited liability (Total Cost Investment $11,000).
* No overhead, no employees.
* Passive Investment (no selling required).
* High profit potential ($135,000+) to you.
* Complete control (you contract with distributors of your choice).
* Exclusive rights to property during lease term.
* Limited liability leveraged lease (up to 400%).
* Lease payment is 100% tax write off ($9,500).
* Inventory cost to you $1,500 (one time cost).
* Investment tax credit pass through from Lessor (AEL) to Lessee (you) of $18,500.

Any difference in the above amount and 1982 taxes owed is available to taxpayer to secure a refund of taxes paid in 1979, 1980 and 1981 until excess is fully applied. If credit is not fully used up by this procedure, any remaining credit would be applicable to tax liability for 1983, 1984 and 1985.

The 1981 Economic Recovery Act allows for excess ITC to be carried forward 15 years from enactment.

\* \* \* \* \* \* \*

## HOW THE LEASING PROGRAM WORKS

1. You the Lessee have the opportunity to lease an educational audio master tape from A.E.L. for a rental payment of $9,500. This payment is a one time prepaid rental for the entire term of a 7 year lease. There are no additional assessments or liabilities to you, the Lessee, for the seven year term of the lease.

2. Being that you the Lessee's motive for leasing an educational audio master tape is to derive a profit from the sales of your master tape, you must (in addition to leasing the master tape from A.E.L.) cause your master to be distributed to nationwide retail, mail order, and premium outlets to obtain the maximum possible profit potential from the sales of your master tape. In order to do so you must contract with a record and tape distributor to distribute your master tape to the above mentioned outlets. A.E.L. cannot be and is not involved in record and tape distribution, however A.E.L. can recommend various record and tape distributors who will guarantee to (for a fee) manufacture and distribute your audio master for you.

3. Tax Consequences.

(a) You the Lessee can utilize the tax advantages of this program by deducting the investment tax credit and prepaid rental from your federal income taxes.

(b) Under the A.E.L. limited liability lease program there are NO recourse notes for you to sign. When A.E.L. purchases a tape from International Horizon A.E.L. signs a full recourse note (made payable to International Horizons Inc. for $185,000).

A.E.L. is at full risk on signing the note and NOT YOU the Lessee. A.E.L. will however pass through our rightfully earned investment tax credit (to you the Lessee) totaling $18,500 for each master audio cassette leased. Combining all the deductions you the Lessee can obtain an equivalent tax write off of up to 4 to 1 for 1982.

4. Finally the only additional cost to you the Lessee is to pay A.E.L. 50% of revenues received by you from the distributor of royalties generated through sales of your cassette tape.

Although the brochure projected potential revenues from a 7-year lease of a master recording, primary emphasis was on tax benefits to be obtained. The sum of $135,000 "profit" referred to in the materials assumed sales of 450,000 recordings from 1982 through 1988. The forecast of sales and costs projected profit of $11,160, the amount necessary to recoup an investor's cash investment, only after sales of 40,000 units. The brochure did not discuss the likelihood that any volume of sales would be achieved and specifically cautioned that AEL "cannot be and are not involved in the business or [sic] record and tape distribution." The Investment Leasing Program booklet summarized the per tape "profit potential" of an AEL lease investment as follows:

| | Retail | Mail order | Premium |
|---|---|---|---|
| Selling price | $2.49 | $3.99 | $2.00 |
| Costs | | | |
| Manufacturing | .60 | .60 | .60 |
| Advertising | .20 | .50 | .10 |
| Shipping | .10 | .50 | .50 |
| Total costs | .90 | 1.60 | 1.20 |
| Gross profit | 1.59 | 2.39 | .80 |
| Less distributor fee | .95 | 1.43 | .48 |
| Lessor rent | .32 | .48 | .16 |
| Lessee profit | .32 | .48 | .16 |

Petitioner also received a second brochure, described as an "Investment Opportunity Tax Benefit Work Sheet" with an eagle on the front cover under the statement "The Constitution Guarantees Economic Freedom." On the back cover appeared the following:

Judge Learned Hand . . .

"Anyone may arrange his affairs that his taxes shall be as low as possible; He is not bound to choose that pattern which best pays the Treasury; There is not even a patriotic duty to increase one's taxes. Over and over again courts have said that there is nothing sinister in so arranging affairs as to keep taxes as low as possible, everyone does it, rich and poor alike and all do right; for nobody owes any public duty to pay more than the law demands. Taxes are an enforceable exaction, and not a voluntary contribution." *Helvering vs. Gregory* 60 Federal (2d) 809

The interior pages, entitled "American Educational Leasing Presents: A Business Opportunity With A Unique Tax Investment/Tax Shelter," represented the following:

MULTIPLE WRITE-OFF EQUAL TO 4 : 1

NO monthly payments.

NO financing involved.

NO promissory notes to sign.

POSITIVE cash flow potential.

ONE-TIME INVESTMENT of $11,000 ($9,500 + $1,500 total investment in 1982. No further monies required).

PROFIT POTENTIAL—As much as $135,000 over the 7-year period of the investment. Cash distribution yearly, beginning in 1983.

YOUR TAX SAVINGS IN 1982 WILL EXCEED $18,500!!!!

(Please note that if you cannot use the full $18,500 + income tax savings in 1982, you may carryback the excess to 3 prior years for a cash refund (with interest earned) from 1979, 1980, and 1981 in that order. The $18,500 is the INVESTMENT TAX CREDIT. The investment tax credit offsets your federal income tax liability, dollar for dollar. If, after zeroing out your 1982 federal income tax liability, you still have excess investment tax credits left over, you may go back and apply them dollar for dollar against 1983, etc. thru 1997, in that order until the FULL $18,500 IS CONSUMED.)

Depending on your income tax bracket, this is your INCOME TAX SAVINGS (Not deductions, but actual tax savings) for this investment for 1982:

| *30% bracket* | *40% bracket* | *50% bracket* |
|---|---|---|
| $18,907 | $19,043 | $19,179 |

(REMEMBER: Any unused tax savings may be carried back to amend your 1979, 1980, and 1981 income tax returns for cash refunds with interest earned. The Economic Recovery Act of 1981 allows I.T.C. to be carried forward 15 years from date of enactment.)

THE FIRST $18,500 OF YOUR INCOME TAX SAVINGS IS THE ITC (Investment Tax Credit) THAT IS BEING "PASSED THROUGH TO YOU THE LESSEE" BY THE LESSOR.

THE SECOND PART OF YOUR INCOME TAX SAVINGS IS FROM THE AMORTIZATION (write-off) OF THE $9,500 PREPAID 7-YEAR LEASE EXPENSE AT $1,357 TAX DEDUCTION PER YEAR.

THEN IF YOU TAKE THE $18,500 INVESTMENT TAX CREDIT, AND ADD THAT TO THE TAX SAVINGS, THE DEDUCTION OF THE PREPAID LEASE ($1,357) GIVES YOU, YOU HAVE YOUR TOTAL INCOME TAX SAVINGS FOR 1982.

Please go back to page 1 for examples at the bottom of the page.

WITH NO FURTHER INVESTMENT, YOUR INCOME TAX SAVINGS PER YEAR FOR THE NEXT 7 YEARS IS:

| *30% bracket* | *40% bracket* | *50% bracket* |
|---|---|---|
| $407 | $543 | $679 |

This investment/shelter is available for: INDIVIDUALS, SOLE PROPRIETORS, PARTNERSHIPS, AND CORPORATIONS.

THIS INVESTMENT/SHELTER IS REPORTED ON A SCHEDULE "C" FOR ALL NON-CORPORATE INDIVIDUALS.

Petitioner also received a tax opinion dated August 20, 1982, signed by Gary L. Blum (Blum), attorney at law. The tax opinion stated that it was based on representations and documents provided to Blum by AEL. Approximately 3 pages of the 17-page tax opinion were devoted to a discussion of the requirement that the activity must be engaged in for a profit as a prerequisite to deductions claimed by an investor. The tax opinion discussed factors listed in section 1.183-2(b), Income Tax Regs., and cases interpreting the profit objective requirement. At the end of that discussion, the tax opinion stated that "It is likely that the IRS will review the lease and exploitation of the Master to determine if the transaction is engaged in for a

profit, since substantial tax benefits may flow from the transaction."

The tax opinion also devoted approximately three pages to a discussion of "Basis and Valuation." That discussion included the following statements:

> However, in view of the aggressive approach of the IRS in Rev. Rul. 79-432, the IRS may very well challenge the valuation of the Masters and, depending upon the facts and circumstances of each individual case, may prevail in its determination that the amount paid by the Lessor for one or more of the Masters exceeded its fair market value, thereby reducing tax benefits to a Lessee.

> \* \* \* \* \* \* \*

> It appears that the settlement of valuation questions without litigation may become a trend and informal rule of the Tax Court and such a rule could be favorable to the Lessee if a valuation issue is raised by the IRS.

> The Code contains penalties for the underpayment of tax attributable to overstatement of either the value or adjusted basis of a property. A ten percent addition to tax is imposed if the claimed value exceeds the correct value by more than 150 percent but less than 200 percent; a twenty percent addition is imposed if the percentage of overstatement is from 200 to 250 percent; and a thirty percent addition is imposed if the percentage of overstatement exceeds 250 percent.

## The tax opinion concluded as follows:

> The IRS may argue that the arrangements between the Lessor or any distributor with the Lessee are, in essence, license arrangements to distribute the Master. If the arrangements between the parties were treated as a license, rather than (1) a purchase and sale in the case of the Producer and the Lessor, and (2) a management service or sales agency relationship in the case of any distributor and the Lessee, the tax consequences described in this opinion (including the investment tax credit) may not be applicable.

> \* \* \* \* \* \* \*

### VIII. TAX SHELTER ADVISORY PANEL

The IRS has increased its activity in the area of tax sheltered investments. The IRS can be expected to take a particularly aggressive stance in connection with entities engaged in so-called "abusive" tax shelters, including the imposition of negligence penalties. The IRS has also announced that a special task force has been created to ferret out various types of "abusive" shelters and to assist in the publication of revenue rulings designed to put the public on notice as to the position of the IRS with respect to same. Under the manual supplement, MS 426-376, issued in 1978 by the IRS, a return will be forwarded to a tax shelter program when certain criteria are present. These criteria include the following:

(1) First year returns of entity that was formed late in the year;

(2) Large Net loss;

(3) Low gross income;

(4) Non-operating entity;

(5) Negative capital account; and

(6) Capital contributions other than cash.

Although some of these criteria would appear to be absent from the instant transaction as represented to me, no assurance can be given that the IRS will not deem this program to be an "abusive" tax shelter and that the IRS will not publish a ruling involving facts similar to those of the instant situation involving one or more issues.

## CONCLUSION

The opinions expressed herein reflect my current understanding and interpretation of existing legal authorities including existing regulations, rulings and judicial authorities, which are subject to change. No assurance can be given that judicial or administrative bodies, in applying the law to the Lessor or Lessees, will not re-interpret or reject the precedents relied upon in this opinion.

This opinion is limited to the specific facts and conclusions set forth herein and is based on the representations and assumptions set forth above. The opinion does not address itself to matters of state or local law, including state or local tax law, or to matters of federal law, including federal tax law, not explicitly discussed.

This opinion is solely for the use of AEL in connection with evaluating the risks of its Master leasing program. It is applicable only to those potential Lessors whose circumstances are identical to those set out in the Facts and Assumptions section above. It may not be quoted in whole or in part or otherwise referred to in any other context, nor is it to be filed with any governmental agency without my prior written consent.

It is strongly advisable that, prior to leasing a Master, each potential Lessor consult his own financial, legal and tax advisor with regard to the application of this opinion to his own particular circumstances and with regard to matters not covered herein.

Petitioner also received a letter dated July 13, 1982, from Blum to AEL headed "Legal Defense Fund." That letter stated in part:

You have sent me a sum of money to put in a trust account for the establishment of a legal defense fund. The defense fund is to be further funded by depositing two percent (2%) of each lease prepayment paid by lessees of the audio cassette master tapes, until the fund reaches $250,000.

The defense fund will be used to provide assistance and consultation for any requesting leaseholder or their legal representatives in connection with challenges by the Internal Revenue Service of the lease arrangements outlined in your brochure. The defense fund shall remain in

existence for the length of the lease (seven years) or until the fund is exhausted.

\* \* \* \* \* \* \*

If such a defense is implemented for any one leaseholder, the other leaseholders must wait and be governed by the outcome of the defense, unless a different issue concerning the lease arrangement is presented by another leaseholder.

Petitioner did not review the lease program in detail with Tindall, because he recognized Tindall's self-interest as a salesman being compensated for selling the investment. Instead, he called Harold Schwartz, the president and director of operations of AEL, to discuss the investment. According to the AEL brochure, Schwartz's "history ranges from automotive to inventor, to salvage to stockbroker, and financial monetary authority." He had no background, however, relating to production or marketing of recordings or other "educational" materials.

Although he was reluctant to rely on Tindall because of Tindall's self-interest, petitioner was satisfied with representations of Schwartz, despite Schwartz's self-interest and lack of background in the recording business. Aside from his conversation with Schwartz, petitioner did not contact anyone knowledgeable about the master recording industry. He did, in his own words, "check around with some stores in the local area just to see what the feasibility was of maybe them even being potential distribution points." He decided to lease a tape entitled "The History of Texas" without listening to the tape, without securing any independent information about the value of the tape or the likelihood of successful marketing of the tape, and without seeing an appraisal of the specific tape.

Petitioner discussed the anticipated tax benefits of the AEL transaction with Ronald H. Rhemann, a certified public accountant referred to petitioner by Tindall. Rhemann did not attempt to perform any independent investigation of the economic aspects of the AEL transaction, but considered only the tax consequences based on the materials provided by Tindall. Rhemann - discussed those tax aspects with petitioner, particularly with respect to the requirement that the activity be a business operating for a profit. Rhemann advised petitioner that the value of the tape was a key

factor in sustaining petitioner's right to the investment tax credit. Petitioners thereafter employed Rhemann to prepare their tax returns for the years in issue.

On December 29, 1982, petitioner entered into an agreement with AEL entitled "Lease" and referring to a master recording entitled "The History of Texas." The agreement specified a term of 7 years, prepaid rent of $9,500, and additional rental of 50 percent of wholesale distribution revenues payable per annum. The agreement also contained the following provisions:

13. PURCHASE OPTION: The Lessee shall not have the option to purchase the Master Recording.

14. INVESTMENT TAX CREDIT: It is agreed by signature hereon that the Lessor agrees to pass the entire amount of any available investment tax credit to the Lessee. Both parties agree to timely file the appropriate consent agreement with the Internal Revenue Service and any other required documents. (Exhibit 1 to lease)

15. LESSOR'S COVENANTS: Lessor covenants and warrants that it is not a party to any currently effective lease of its rights in the Master Recording and that it has not encumbered its rights in the property other than the purchase money indebtedness tendered payment by Lessor for the Master Recording, nor does it know of any currently effective encumbrances. Lessor further covenants that [it] shall duly perform all of its obligations under this Lease with respect to the Master Recording and Lessor warrants that it has good right title and interest to the Master Recording.

16. RELATIONSHIP BETWEEN LESSOR AND LESSEE: It is fully understood that the relationship between parties hereto shall be that [of] landlord and tenant, governed by the present or future laws of the State of California and that such relationship shall never be interpreted or established as that of partners, joint ventures, co-tenants, principal and agent.

\*       \*       \*       \*       \*       \*       \*

20. ENTIRE AGREEMENT: This instrument constitutes the entire agreement between Lessor and Lessee and it shall not be amended, altered or changed except by a written agreement signed by the parties hereto.

Petitioner paid the sum of $9,500 to AEL on December 29, 1982.

Also on December 29, 1982, petitioner entered into a "Distribution Agreement" with Mark 56 Records, and, on December 30, 1982, petitioner paid $1,500 to Mark 56 Records in relation to the distribution agreement. The

distribution agreement provided in pertinent part as follows:

2 (a) Lessee hereby retains the services of the Distributor for the sum of $1,500.00 (one thousand five hundred dollars) to use each and every Master for the purpose of manufacturing and selling cassette tapes and phonograph records, both long playing and singles, together with cassettes and tapes, therefrom upon the terms and conditions of this Agreement throughout the Territory. Lessee will furnish Distributor with the Masters on execution of this Agreement or as soon thereafter as possible.

      *      *      *      *      *      *      *

(g) Distributor hereby agrees to maintain a sufficient inventory of records derived from the Master to fulfill orders for the term of this Agreement. Distributor agrees that in any event it shall manufacture and have ready for distribution not less than 750 cassette tapes and/or phonographic records or any combination thereof.

      *      *      *      *      *      *      *

5 In respect to the Masters hereunder, and in full consideration for the rights herein granted, Lessee will pay to Distributor the following fees for the manufacture, distribution, promotion and sale of the Masters.

(a) for singles long play recordings, pre-recorded tapes and all other uses, a distribution fee of sixty percent (60%) of net receipts from the sale of such long play recordings, and Lessee shall receive forty percent (40%).

(b) the term "net receipts" shall be deemed to mean all monies (gross receipts) received by distributor from the sale and exploitation of the master tape, less costs for promotion, advertising, shipping and cassette or phonograph record duplication.

6 Distributor shall collect all monies derived from this Agreement and shall remit to Lessee all of the net receipts so collected.

(a) Amounts payable to Lessee shall be due and payable to Lessee and shall be computed for the preceding six (6) calendar month period within one hundred twenty (120) days after June 30th and December 31st of each year so long as tapes and records embodying performances embodied on the Masters are sold and paid for. Such amounts will be paid to Lessee within such one hundred twenty (120) day period and will be accompanied by appropriate statements setting forth all gross receipts and disbursements made therefrom in accordance with this Agreement for the prior six month period. All statements and all other accounts rendered by Distributor to Lessee shall be binding upon Lessee and not subject to any objection by Lessee for any reason unless specified objection in writing, stating the basis thereof, is received by Distributor within two (2) years from the date rendered, in which event such statements shall be binding in all respects except for those specifically stated in such written objections. All statements, payments, notices and correspondence to Lessee shall be sent to Lessee at the address indicated

above unless prior written notice to the contrary is received from Lessee. Distributor shall be entitled to maintain reasonable reserves against returns to Distributor of records embodying performances embodied on the Masters distributed hereunder. However, all reserves must be liquidated at the end of the sell-off period as herein specified.

Petitioner never arranged for production of any more than 750 cassette tapes from "The History of Texas." Petitioner never saw or heard the actual master recording. He did not determine whether 750 or any number of copies of the recording had been manufactured. On or about February 25, 1983, AEL sent petitioner three cassettes manufactured from the tape he had leased. Petitioner thereafter received only two income statements from Mark 56 Records, for periods ended April 1, 1983, and September 30, 1983. Both income statements reported no sales of petitioner's master recording. After 1982, petitioner made a few telephone calls to AEL and Mark 56 Records but made no serious efforts to market tapes produced from the master recording. Petitioner merely surveyed stores in the Houston area marketing cassette tapes and reported on his survey to Mark 56 Records.

In February and March 1983, petitioner received three one-page documents entitled "Master Recording Appraisals" purporting to value the master recording entitled "The History of Texas" at $225,000, $225,000, and $250,000, respectively. The printed form of each document was identical, although the amounts and appraisers differed. Although each appraisal purported to use the "income forecast method," none of the appraisals contained any analysis supporting the value set forth. Petitioner did not rely on those appraisals at any time because of his view of the unreliability of the appraisal process. Petitioner believed that the actual price paid for the tape by AEL would be a better indication of value.

The master recording "The History of Texas" was produced at a cost not exceeding $330 and had a negligible fair market value.[2] AEL paid $1,000 and gave a 14-year

---

[2]Respondent proposed extensive findings concerning the manner in which the tape was produced and the reasons for concluding that it had no fair market value, based on respondent's expert testimony. Petitioner objected to those findings on grounds of relevance and presented no contrary evidence of fair market value. Petitioner contends that the fair market value evidence is not relevant to petitioner's intent. Because there is no conflicting evidence concerning fair market value, we see no reason to set forth in detail the facts

non-negotiable note, dated December 31, 1982, for $185,000, bearing 10-percent interest, to International Horizons Inc. (IHI) for the recording. Prior to the end of 14 years, payments were due only from AEL's gross receipts from sales of tapes produced from the master recording. The note was secured by the master recording under a contemporaneously executed Security Agreement.

On their joint Form 1040, U.S. Individual Income Tax Return, for 1982, petitioners claimed a loss on Schedule C of $2,857, consisting of $1,357 (1/7 of the $9,500 lease fee) as "rent on business property" and $1,500 "distributing fees." They claimed $185,000 as "qualified investment" based on a claimed fair market value of $185,000 for the master recording. They claimed a "tentative regular investment credit" of $18,500, reducing their reported income tax liability from $24,550 to $6,050, resulting in a claimed refund of income tax withheld of $15,088.47.

On their 1983 Form 1040, petitioners claimed on Schedule C a loss of $1,357 as "rent on business property" (1/7 of the $9,500 lease fee).

In the statutory notice of deficiency, respondent disallowed the investment tax credit and deductions claimed and determined the additions to tax set forth above. The Explanation of Adjustments for 1982 included the following:

### SCHEDULE C AND INVESTMENT TAX CREDIT

It is determined that the alleged losses and investment tax credits claimed on your income tax return with respect to Music Recordings are not allowed because you have not established that the transactions were bona fide arm's-length transactions at fair market value or that such transactions had any economic substance other than the avoidance of taxes. It is further determined that the losses and investment tax credits are not allowed because you have not established that the transactions were incurred in a trade or business entered into for profit.

If the determinations set forth above are not sustained, then it is determined that:

---

supporting the ultimate finding that the fair market value was negligible, which is the only finding supported by the evidence. Details concerning the production of tapes for AEL are set forth in *Apperson v. Commissioner*, T.C. Memo. 1987-571, and *United States v. H & L Schwartz, Inc.*, an unreported case (C.D. Cal. 1987, 60 AFTR 2d 87-6031, 87-2 USTC par. 9643).

1. The losses are not allowed because you have not established that your method of accounting clearly reflects income or that any amounts deducted were paid or incurred, were ordinary and necessary business expenses, or were anything other than a capital expense.

2. The investment tax credits are not allowed because you have not established: (a) that you qualify for investment tax credit pass-through from the alleged asset's lessor, (b) that the fair market value of basis of the alleged asset is other than zero, (c) that the alleged asset was placed in service in the year claimed, (d) that the alleged asset is tangible property, or (e) that the alleged asset is anything other than a license or non-exclusive right.

It is further determined that if any loss or credit is allowable, such loss or credit is limited to the amount that you and/or the alleged asset's lessor are at risk within the meaning of I.R.C. sections 46(c)(8) and 465.

In the petition filed January 31, 1986, petitioners alleged in part:

4. The determinations of tax and additions to tax, set forth in the notice of deficiency, are based upon the following errors:

*    *    *    *    *    *    *

(b) Respondent erred in determining that petitioners are not entitled to claim an investment tax credit for a master educational recording leased by petitioner Ronald W. McCrary in the taxable year 1982.

*    *    *    *    *    *    *

5. The facts upon which petitioners rely, as the basis for their case, are as follows:

(a) In 1982, petitioner Ronald W. McCrary leased a master educational recording ("educational recording") from American Educational Leasing ("AEL") for a term of 85 months. As consideration for use of the educational recording, he was required to make rental payments to AEL. All payments required by the lease agreement have been made.

(b) Under the lease agreement referred to in the preceding subparagraph, AEL, in accordance with I.R.C. sec. 48(d) and applicable Treasury Regulations, elected to treat Mr. McCrary as having acquired the educational recording, which was new tangible property, for its fair market value. On the date leased, the educational recording had a fair market value of not less than $185,000.

In an amendment to petition filed June 8, 1988, a little over a month prior to trial, petitioners alleged in part:

Petitioners amend their petition for this case as follows:

(1) Subparagraph (b) of paragraph 4 is deleted.
(2) Addition of the following subparagraph to paragraph 4:

(g) If respondent correctly determined that there are tax underpayments attributable to a valuation overstatement, negligence or substantial understatement of tax, he erred and abused his discretion in not waiving imposition of these additions to tax.

(3) Addition of the following to subparagraph (a) of paragraph 5.

As initially executed by Mr. McCrary and AEL, the lease was nonexclusive and Mr. McCrary was granted the domestic distribution rights for the educational recording. In 1984 the lease agreement was modified to provide that Mr. McCrary was granted the exclusive right to use the educational recording for the lease term.

(4) Deletion of the phrase "in accordance with I.R.C. sec. 48(d) and applicable Treasury Regulations," from the second and third lines of subparagraph (b) of paragraph 5.

(5) Addition of the following subparagraphs to paragraph 5.

(i) There was a reasonable basis for the valuation, if any, attributed to the educational recording on petitioners' return for the taxable year 1982 and such valuation, if any, was made in good faith.

(j) Respondent abused his discretion in not waiving the additions to tax proposed against petitioners as he has waived such additions to tax in cases involving similarly situated taxpayers.

## OPINION

This case is a test case for numerous taxpayers who invested in the AEL master recording lease program. For reasons discussed below, we reject petitioner's argument that his intent in entering into the master recording transaction distinguishes him from those taxpayers who failed to sustain claimed deductions and investment tax credits in *Apperson v. Commissioner*, T.C. Memo. 1987-571, on appeal (7th Cir., Mar. 9, 1988), and in every other case decided by this Court involving the lease or sale of a master recording. See, e.g., *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *Morrow v. Commissioner*, T.C. Memo. 1988-372; *Avers v. Commissioner*, T.C. Memo. 1988-176; *Lowenbach v. Commissioner*, T.C. Memo. 1987-496; *Hawkins v. Commissioner*, T.C. Memo. 1987-233; and cases cited in *Secoy v. Commissioner*, T.C. Memo. 1987-286, n. 8, on appeal (9th Cir., Dec. 7, 1987). Respondent moved for damages under section 6673 because of the similarity of this case and those cited.

Petitioners have been candid, however, in explaining that trial of this case was necessitated by the cumulation of various additions to tax determined by respondent. They summarize the situation as follows:

Excluding the alternative determination under I.R.C. sec. 6661, the proposed deficiencies, additions to tax (sometimes referred to as penalties in this brief) and damages total $42,536.40. Twenty-two thousand one hundred eighty dollars and ninety-seven cents ($22,180.97) of this amount, represents penalty and damage liabilities and reflects a determination by respondent that petitioners should pay about $1.09 in penalties and damages for each dollar of tax which is due. Excluding both the I.R.C. sec. 6661 alternative determination and the claim for damages, tax deficiencies of $20,355.42 and penalty liabilities of $17,180.97 have been proposed with a resulting ratio of about eighty-five cents of proposed penalties for each dollar of tax liability asserted.

Petitioners agree that the investment tax credit in the amount of $18,500.00 claimed on their 1982 return is not allowable, leaving in dispute proposed tax deficiencies totaling $1,855.43 and proposed penalties and damages, exclusive of the section 6661 penalty, totaling $22,180.97.

Petitioners' concession that the agreement was not a lease during the years in issue was intended to avoid the addition to tax under section 6659 by invoking the rationale of *Todd v. Commissioner,* 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). At the time of that concession, respondent was challenging the correctness of our opinion in *Todd* by an appeal to the Court of Appeals for the Fifth Circuit, to which our decision in this case is also appealable. Respondent also argues that *Todd* is distinguishable, as discussed below.

### *Profit Objective/Economic Substance*

The facts relied on by petitioners to support their claimed deductions are summarized by them as follows:

—Prior to hearing of the AEL lease program, Mr. and Mrs. McCrary had used educational cassette tapes and he was impressed with the tapes as a training tool.

—When contacted by an AEL salesman in November, 1982, Mr. McCrary did not react by stating, "Where do I sign?" Instead, believing that the sales representative would not provide an objective analysis of the investment, he decided to research the program himself.

—All of the materials pertaining to the lease investment ("offering materials") were analyzed by Mr. McCrary prior to leasing a tape from AEL.

—The offering materials reviewed by Mr. McCrary contained income projections stating that, without regard to potential tax savings, a profit could be realized from a lease investment.

—The offering materials reviewed by Mr. McCrary contained correspondence from Mark 56 outlining past success of that company and its access to markets for educational tapes.

—The offering materials reviewed by Mr. McCrary contained an appraisal stating a value of $234,000.00 for an AEL tape.

—A legal opinion letter reviewed by Mr. McCrary stated that AEL had made a cash payment for each of its master tapes and was personally liable for the balance of the purchase price of each tape.

—Prior to leasing a tape, Mr. McCrary borrowed a sample AEL tape and listened to it at his home.

—Prior to deciding to lease a tape, Mr. McCrary reviewed the business and tax aspects of the lease investment with his accountant.

—In deciding whether to lease a tape, Mr. McCrary spoke with Harold Schwartz, the President of AEL. Mr. Schwartz caused Mr. McCrary to believe that the lease investment program was legitimate.

—In connection with his analysis of whether or not he should lease a tape, Mr. McCrary contacted retail stores selling cassette tapes in Houston for the purpose of determining whether there was a market for educational tapes.

—Within 60 days of leasing a tape, Mr. McCrary brought the results of his survey of retail outlets to the attention of Mark 56, the distributor hired by him.

—After leasing a tape, Mr. McCrary made telephone calls to both AEL and Mark 56 to discuss the status of his investment.

—In early 1983, Mark 56 notified Mr. McCrary of an extensive and impressive advertising campaign for his tape and that of other lessees of AEL.

—In February, March and April, 1983, Mr. McCrary received appraisal reports for the educational tape he leased from three appraisers, represented to be qualified appraisers. The reports stated values of from $174,588.00 to $250,000.00 for the tape.

—In May, 1983, he received a Mark 56 catalogue which listed his leased tape as one of a newly recorded audio cassette library. [Transcript, stipulation, and exhibit references omitted.]

Respondent argues that petitioner's transaction with AEL lacked economic substance and is otherwise indistinguishable from *Apperson v. Commissioner, supra.* In that case, we analyzed the AEL master recording lease program under the unified approach set forth in *Rose v. Commissioner,* 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). We concluded that the AEL master recording program lacked economic substance and that the taxpayers were not entitled to any deductions or investment tax credit. In *Apperson,* we were also faced with an objection by the taxpayers to respondent's motion to amend his answer to assert additional grounds for disallowance of the investment tax credit and deductions, specifically to claim that the transactions lacked economic substance. We stated:

As we stated in *Rose v. Commissioner,* 88 T.C. 386, 408-415 (1987) [affd. 868 F.2d 851 (6th Cir. 1989)], cases applying the "subjective" profit objective test of section 183 show common characteristics of those in which the "objective" test of economic substance has been applied. Thus we adopted a unified approach in which—

the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case. [88 T.C. at 414-415.]

The parties were advised at trial that this case would be analyzed under the unified approach. Petitioners have not shown, and apparently cannot show, any way in which the evidence would differ depending on whether we are determining profit objective under section 183 or using the unified approach of *Rose v. Commissioner, supra.* Thus they are not prejudiced by our consideration of the economic substance of the transaction. * * *

See also, *Rybak v. Commissioner,* 91 T.C. 524, 535 (1988). Nonetheless, petitioners here decline to address respondent's contentions that their master recording transaction lacked economic substance, based on respondent's analysis of the factors set forth in *Rose.* Petitioners do not contend that the tape had a value of $185,000 or that there was any objective possibility of profit from the transaction. Petitioners argue only that they are entitled to the deductions because subjectively petitioner had an actual and honest objective of making a profit from sale of products manufactured from the tape. Petitioners also argue that respondent

misinterprets *Rose* to the extent that respondent contends that a conclusion that the transaction lacks economic substance precludes deductions without regard to petitioners' subjective intent.

A transaction devoid of economic substance is not recognized for tax purposes. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978); *Knetsch v. United States,* 364 U.S. 361, 366 (1960); *Cherin v. Commissioner,* 89 T.C. 986, 992-994 (1987), on appeal (11th Cir., Sept. 15, 1988). A taxpayer's subjective intent, however, is a factor to be considered in determining whether the transaction had economic substance. See *Sochin v. Commissioner,* 843 F.2d 351, 353-354 (9th Cir. 1988), affg. *Brown v. Commissioner,* 85 T.C. 968 (1985); *Cherin v. Commissioner,* 89 T.C. at 992 n. 13. Petitioners are correct that *Rose* did not dispense with the subjective profit objective test. See *Rose v. Commissioner, supra.* Implicit in *Rose,* however, is the conclusion that a transaction that is found to lack economic substance under the approach there adopted is one in which objective factors preclude finding that the taxpayer had an actual and honest profit objective. A transaction that has a business purpose or profit objective will survive the *Rose* analysis of economic substance. *Rose* simply reformulated a two-pronged test into a unified approach in certain types of cases. The approach of *Rose* was introduced by the following language:

Review of those cases applying the "subjective test" (of section 183) shows common characteristics reminiscent of those in which the "objective test" (of economic substance) has been applied: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. In cases having these characteristics, tax motivation is apparent. The question addressed is whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. Such cases, hereinafter referred to as "generic tax shelters," involve a variety of assets * * * [*Rose v. Commissioner,* 88 T.C. at 412-413. Fn. ref. omitted.]

\* \* \* \* \* \* \*

In any case where a taxpayer establishes a business purpose, i.e., an actual and honest profit objective, we may still recharacterize the terms of the transactions to accord with what we perceive to be the reality of the situation. * * * [Citations omitted.]

While the subjective test is thus well founded in section 183, a unified approach emphasizing objective factors is preferable in cases involving generic tax shelters, i.e., those having the characteristics listed above at pages 412-413. First, because this approach emphasizes objective factors, it is more susceptible to consistent and predictable application. Second, because it does not require weighing the objective facts against a taxpayer's statement of his intent, it should be more understandable to taxpayers who doubt our ability to determine their subjective state of mind. Third, taxpayers similarly situated will be treated the same for tax purposes. Fourth, the test allows us to separate the real economic aspects from the "financial fantasies" surrounding a transaction and to apply the tax laws accordingly,[7] rather than to disallow all deductions (or limit them to gross income under section 183(b)(2), which in the typical case is zero). As applied below, the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case.

---

[7]In *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), the Court of Appeals for the Seventh Circuit stated:

The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans.

* * * The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future.

[*Rose v. Commissioner*, 88 T.C. at 414-415.]

Certainly *Rose* did not depart from the principle that a reasonable expectation of profit (as contrasted to an actual and honest profit objective) is not required. See *Rose v. Commissioner*, 88 T.C. at 411, quoting *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976).

Petitioner admits that he took into account the anticipated tax benefits from the transaction. A denial that he did would be given little credence in view of the focus of the

promotional materials and his discussions with Rhemann. He asserts, nonetheless, that he believed that he would recoup his $11,000 investment by sales of tapes made from the master recording. This assertion, however, is not credible for a variety of reasons: (1) Petitioner testified that he did not rely on Tindall, the salesman, because of his obvious self-interest, but he was satisfied by representations of Schwartz, the principal of the seller. (2) He accepted the representation that the value of the master recording was $185,000, although he had not seen the recording (because it was not yet produced) and had no information about the quality of the recording or the likelihood of sales of the recording. (3) Petitioner claims that he relied on the $185,000 purchase price purportedly paid by AEL to IHI as establishing fair market value of the master recording. Petitioner was trained and employed to evaluate collateral for loans. In view of his training as a loan officer, however, petitioner must have known that a non-negotiable note, payable only from gross receipts for 14 years, at 10-percent interest, did not reflect fair market value. (4) Recoupment of his $11,000 would have required sales in excess of 40,000 copies, although he contracted for only 750 copies and never made any effort to see whether those copies were in fact produced. Neither he nor anyone with whom he contracted was otherwise required to, or in fact did, sell any tapes made from the master recording. (5) His attempts to follow up on the investment consisted of a few telephone calls. (6) At the end of December 1982, petitioner made payments totaling $11,000, for which he claimed a tax credit of $18,500 on his tax return filed a few months later.

Regardless of the methodology followed, petitioner has not persuaded us that he entered into the master recording activity with the objective to make a profit rather than solely to obtain tax benefits. The subjective test cases routinely consider factors listed in section 1.183-2(b), Income Tax Regs. (and incorporated in the *Rose* analysis), to wit:

(1) Manner in which the taxpayer carries on the activity.
(2) The expertise of the taxpayer or his advisors.
(3) The time and effort expended by the taxpayer in carrying on the activity.

(4) Expectation that assets used in activity may appreciate in value.
(5) The success of the taxpayer in carrying on other similar or dissimilar activities.
(6) The taxpayer's history of income or losses with respect to the activity.
(7) The amount of occasional profits, if any, which are earned.
(8) The financial status of the taxpayer.
(9) Elements of personal pleasure or recreation.

Petitioners employ this analysis in their briefs. The facts found, however, preclude a conclusion that any one of those factors supports petitioners' position in this case.

We have cited above the numerous master recording cases in which we have rejected similar contentions of taxpayers. We see no necessity to repeat here more excruciating analysis of the factors repeatedly discussed, recently, e.g., in *Morrow v. Commissioner*, T.C. Memo. 1988-372.

The AEL promotional brochures, with their use of red, white, and blue graphics, stars and stripes, and references to the Constitution are reminiscent of less sophisticated tax protestor cases. See *Watts v. Commissioner*, T.C. Memo. 1985-531, in which the promoter of master recording schemes testified candidly that he sought to create tax shelters so that "guys with little bucks" could do what "guys with big bucks did." These proceedings in which the courts repeatedly have considered the same arguments by taxpayers and rejected them entirely have led us to the point where we should simply state "that they are completely without merit" and should be dealt with "summarily and decisively * * * without engaging in scholarly discussion of the issues." See *Derksen v. Commissioner*, 84 T.C. 355, 357, 360 (1985), quoting *McCoy v. Commissioner*, 76 T.C. 1027, 1029-1030 (1981), affd. 696 F.2d 1234 (9th Cir. 1983). Because of the disputes over the applicability of the additions to tax, we have denied by separate order respondent's motion for damages under section 6673. Otherwise we would have readily awarded damages of $5,000 to the United States in this case. See *Apperson v. Commissioner*, T.C. Memo. 1987-571, n. 6.

In an analogous case involving book manuscripts, *Barnard v. Commissioner*, 731 F.2d 230, 232 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983), the Court of Appeals commented:

The long and the short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path; if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. * * * [Fn. ref. omitted.]

Obviously petitioners are not entitled to the deductions that they claimed in relation to the master recording. The additions to tax discussed below, which petitioners contend are so oppressive, result from the view of Congress that the taxpayer should be "worse off than had they never sought the unjustified benefits in the first place."

### Section 6653(a)

Section 6653(a) provides a bifurcated addition to tax "if any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations." Petitioners contend that they are not liable for the addition to tax under section 6653(a) because they relied on a certified public accountant to prepare their tax returns and the accountant was familiar with the AEL program. Such purported reliance, however, does not absolve petitioners of the liability under section 6653(a) when they were aware that the facts upon which their entitlement to deductions depended were not present. See, e.g., *Rybak v. Commissioner*, 91 T.C. 524, 544 (1988); *Patin v. Commissioner*, 88 T.C. 1086, 1130-1131 (1987), affd. sub nom. without published opinion *Hatheway v. Commissioner*, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. without published opinion *Skeen v. Commissioner*, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion *Patin v. Commissioner*, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *Gomberg v. Commissioner*, 868 F.2d 865 (6th Cir. 1989).

Rhemann testified that the AEL salesman, Tindall, initiated the contact between Rhemann and petitioners. Thus it appears that petitioners deliberately employed a certified public accountant who would agree with the tax treatment of the transactions while purporting to insulate them from additions to tax. In view of the obvious purpose of the

arrangement, securing $18,500 in immediate tax benefits for a payment of $11,000, it seems to us that "no reasonable person would have trusted this scheme to work." *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. Such a windfall, without any requirement of further effort, was patently too good to be true.

Moreover, petitioner testified that he read carefully all of the materials presented to him,[3] including Blum's tax opinion. That tax opinion specifically raised the likelihood of Internal Revenue Service challenges to the deductions and set forth the grounds of those prospective challenges. The tax opinion also specifically stated: "The IRS can be expected to take a particularly aggressive stance in connection with entities engaged in so-called 'abusive' tax shelters, including the imposition of negligence penalties." After listing criteria considered by the IRS to indicate "abusive" shelters, the tax opinion merely stated that "some of these criteria would appear to be absent from the instant transaction as represented to me."! The opinion assumed facts shown here to be inaccurate and known by petitioners to be inaccurate. It disavowed any independent prediction of the outcome of any dispute. By a separate letter concerning the "legal defense fund," petitioners were advised that a fund of $250,000 was being prepared, made up of deposits representing 2 percent of each lease prepayment paid by lessees of the audio cassette master tapes, to litigate disputes with the IRS over the program. Under these circumstances, it is fair to characterize petitioner's conduct as transcending negligence, to wit, as deliberate or "intentional" disregard of rules and regulations.[4]

---

[3]There is a dispute between the parties over whether petitioner received certain documents in evidence prior to entering into the transaction. Petitioner's testimony on this point was confused, inconsistent, and partly responsive to leading questions by his counsel. The disputed documents not described in our findings of fact are immaterial to our conclusion.

[4]Sec. 6653(a)(3) of the Internal Revenue Code of 1986 set forth the following definition of negligence:

(3) NEGLIGENCE.—For purposes of this subsection, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard.

The new provision is applicable to returns the due date of which is after Dec. 31, 1986. Although the provision is not applicable to the years in issue, the following explanation from the Senate Committee Report should be noted:

## Section 6659

Section 6659(a) imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement." Section 6659(c) provides that "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)."

We have sustained additions to tax under section 6659 on the ground that the basis claimed on the return exceeded the correct adjusted basis in the property. See, e.g., *Zirker v. Commissioner,* 87 T.C. 970, 978-979 (1986).

In this case, however, we have not determined adjusted basis. Petitioners' entitlement to deductions for rent and the distributor's fee were disallowed without regard to any claim of basis or determination with respect to fair market value and thus do not support an addition to tax under section 6659. *Ferrell v. Commissioner,* 90 T.C. 1154, 1204 (1988); *Soriano v. Commissioner,* 90 T.C. 44, 61 (1988); *Zirker v. Commissioner,* 87 T.C. at 980.

Petitioners in this case claimed on their 1982 return an investment tax credit base and a fair market value equal to the price purportedly paid by AEL to IHI, $185,000. They were not entitled to include the note from AEL to IHI in calculating the credit base. Secs. 46(c)(8) and 48(d)(6). The fair market value of the property was negligible. Prior to trial of this case, however, petitioners conceded that they were not entitled to the investment tax credit because the agreement was a license and not a lease. Thus they have not disputed the fair market value of the master recording or the correct amount of the investment tax credit base. Petitioners contend that under *Todd v. Commissioner,* 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), section 6659 does not apply because the underpayment of $18,500

---

The bill also generally redrafts the negligence penalty to make it clearer and more comprehensible. One element of that redrafting involves the provision of a definition of negligence. The bill includes within the scope of the definition of negligence both any failure to make a reasonable attempt to comply with the provisions of the Code as well as any careless, reckless, or intentional disregard of rules or regulations. The bill does not, however, limit the definition of negligence to these items only. Thus, all behavior that is considered negligent under present law will remain within the scope of this negligence penalty. Also, any behavior that is considered negligent by the courts but that is not specifically included within this definition is also subject to this penalty. [S. Rept. 99-313 (1986), 1986-3 C.B. 1, 181.]

resulting from the erroneous claim of investment tax credit is not attributable to a valuation overstatement.

In *Todd v. Commissioner, supra,* we found that an underpayment was not attributable to a valuation overstatement when property was not placed in service during the years in issue. In affirming our decision, the Court of Appeals agreed that Congress apparently intended that the calculation of an underpayment attributable to a valuation overstatement be made " '*after*' taking account of '*any* other proper adjustment to tax liability.' " 862 F.2d at 542.

In *Todd,* respondent argued before us that the result was not equitable because taxpayers who purchased an asset and claimed a valuation overstatement on their tax returns but also did not place the asset in service during the years in issue would avoid the addition to tax under section 6659 whereas taxpayers who merely claimed the valuation overstatement would be subject to the addition to tax. We responded:

> We do not agree with respondent that this result is not logical or equitable. The consequence of determining that an asset was not placed in service during the years in issue is to disallow all deductions and investment tax credit relating to that asset. * * * Moreover, if a taxpayer were to concede that an asset was not placed in service and that no deductions or credits are allowable in order to avoid an addition to tax, could that concession reasonably be refused? [*Todd v. Commissioner,* 89 T.C. at 918-919.]

Petitioners' concession in this case is apparently in response to the rhetorical question thus posed in *Todd.*

Respondent argues that *Todd* is distinguishable because here petitioners continued to contest other deductions, thus forcing a trial, and we have not made a determination of an alternative ground for disallowance of the investment tax credit. Respondent contends that petitioners cannot *selectively* concede a ground for disallowance in order to avoid an addition to tax. We agree with respondent that this case may be distinguished, but there are certainly many cases in which taxpayers concede a single ground for disallowance of an item, thus avoiding the necessity of trial in a case. The question is whether the distinctions in this case make a difference, particularly in view of the *Todd* opinion of the

Court of Appeals for the Fifth Circuit, to which our decision in this case is appealable.

On appeal, the Commissioner apparently made equitable arguments similar to those made before us in *Todd.* The Court of Appeals stated (862 F.2d at 544-545):

Finding no explicit support for his position, the Commissioner argues that the policies underlying section 6659 mandate imposition of the addition to tax in this instance. He notes that Congress wanted to make tax shelters based on property overvaluations less attractive. To allow the Todds to significantly overvalue the adjusted basis of these food containers on their tax returns without suffering an addition to tax would supposedly frustrate the policies behind section 6659. We point out, of course, that the Todds did not benefit from their tax shelter, since their depreciation deductions and investment tax credits were denied in full. Further, it is probable that Congress was balancing competing policies when it determined how to apply section 6659. First, Congress may not have wanted to burden the Tax Court with deciding difficult valuation issues where a case could be easily decided on other grounds.[14] Second, Congress may have wanted to moderate the application of the section 6659 penalty so that it would not be imposed on taxpayers whose overvaluation was irrelevant to the determination of their actual tax liability.[15] We cannot say for certain why Congress chose this test to measure section 6659 liability, rather than modifying the formula to address the Commissioner's concerns. However, we remain convinced that the formula set out above represents Congress' intent for determining whether to impose the section 6659 addition to tax in any given case.

Finally, appellant argues that the Tax Court decision leads to anomalous results. * * * The Commissioner also raises the spectre that under the Tax Court ruling, taxpayers might avoid section 6659 penalties by denying they had a profit motivation in entering the transactions in issue.

\*       \*       \*       \*       \*       \*       \*

We note, however, that the results the Commissioner deplores may not be as inequitable as he argues. First, while the Hendricks and Hillendahls had to pay a section 6659 penalty, they were also allowed to retain a portion of their claimed depreciation deductions and investment tax credits. The Todds, on the other hand, while escaping the section 6659 penalty, were denied any of their claimed deductions and credits for the years in question. * * *

Finally, the fear that taxpayers will deny profit motivation to avoid section 6659 penalties, is unimpressive. Significant penalties attach to tax underpayments attributable to fraud, negligence, or tax motivated transactions. To the extent a taxpayer took the position that he entered a transaction without profit motive, but still claimed tax benefits relating to the transaction, he might well win a Pyrrhic victory, escaping section

6659 penalties only to subject himself to a much larger seventy-five percent penalty for fraud.

[14] Congress saw sec. 6659 as a measure to help the Tax Court control its docket: * * *

* * * While Congress desired the penalties to be applied in "appropriate" cases, it may not have wanted the Tax Court to have to decide difficult valuation questions for no reason other than the application of penalties. Though judicial economy is not a factor in this case, where the Tax Court had already determined the correct value of the property in issue, the rule we adopt will determine whether the Commissioner can force the Tax Court to decide valuation issues in the future for the sole purpose of imposing a sec. 6659 addition to tax.

[15] * * *

Congress recognized that valuation questions involve difficult factual determinations. For this reason, it applied sec. 6659 only to significant overvaluations. *See* Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 332 (Comm. Print 1981). The same concerns may have led Congress to develop a test which would not penalize overvaluations having no effect on the taxpayer's tax liability. Further, Congress may have concluded that with significant penalties for fraud, negligence and tax motivated transactions, the Commissioner possessed sufficient weapons to deter tax shelter schemes without making sec. 6659 too draconian.

Following this language, we feel compelled first to apply the formula referred to by the Court of Appeals and in our *Todd* opinion, to wit:

Under the first step (1), we calculate the amount of tax liability for each year as if all items had been reported properly, i.e., as if petitioners had not claimed any investment tax credit * * * [because the agreement was a license and not a lease] during the years in issue. Next (2), without taking into account any adjustments that are attributable to the valuation overstatement, we calculate the amount of tax liability as if all other items had been reported properly. Finally (3) because there is no difference between the amounts calculated under steps (1) and (2), no part of the underpayment is attributable to the valuation overstatement. [89 T.C. at 918.]

Under the formula, section 6659 does not apply to the underpayment attributable to the investment tax credit.

We made a determination of fair market value in this case only because of the disputes over the additions to tax. We cannot conclude that petitioner required a trial that otherwise would have been unnecessary or that petitioner forced

us to decide "difficult valuation issues where a case could be easily decided on other grounds." We can conclude that respondent would have us decide those issues for the purpose of imposing the addition to tax. Moreover, as discussed below, a concession to avoid a 30-percent addition to tax on a portion of the underpayment under section 6659 would appear to be a "Pyrrhic victory" (*Todd v. Commissioner*, 862 F.2d at 545) where the alternative is a 25-percent addition to tax on the whole underpayment under section 6661.[5]

For the foregoing reasons, we conclude that section 6659 does not apply to any portion of the underpayment in this case.

### Section 6661

Section 6661 imposes an addition to tax "if there is a substantial understatement of income tax for any taxable year." Such amounts assessed after October 21, 1986, are in an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. *Pallottini v. Commissioner*, 90 T.C. 498 (1988). Section 6661 defines a substantial understatement (for taxpayers other than corporations or personal holding companies) as follows:

SEC. 6661(b). DEFINITION AND SPECIAL RULE.—
(1) SUBSTANTIAL UNDERSTATEMENT.—
(A) IN GENERAL.—For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—
(i) 10 percent of the tax required to be shown on the return for the taxable year, or
(ii) $5,000.

The amount subject to the addition to tax may be reduced in accordance with the following:

SEC. 6661(b). DEFINITION AND SPECIAL RULE.—

\*    \*    \*    \*    \*    \*    \*

(2) UNDERSTATEMENT.—

\*    \*    \*    \*    \*    \*    \*

---

[5]We are confident that by its reference to an alternative addition for fraud, the Court of Appeals for the Fifth Circuit did not mean to invite belated motions by respondent to amend answers to allege fraud after a concession by the taxpayers in compromise of a pending case.

(B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAX-PAYER OR DISCLOSED ITEM.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

(C) SPECIAL RULES IN CASES INVOLVING TAX SHELTERS.—

(i) IN GENERAL.—In the case of any item attributable to a tax shelter—

(I) subparagraph (B)(ii) shall not apply, and

(II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

(ii) TAX SHELTER.—For purposes of clause (i), the term "tax shelter" means—

(I) a partnership or other entity,

(II) any investment plan or arrangement, or

(III) any other plan or arrangement,

if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

(3) COORDINATION WITH PENALTY IMPOSED BY SECTION 6659.—For purposes of determining the amount of the addition to tax assessed under subsection (a), there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659 (relating to addition to tax in the case of valuation overstatements).

(c) AUTHORITY TO WAIVE.—The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

Petitioners argue that the arrangement was not a tax shelter and that respondent abused his discretion in refusing to waive the addition to tax. These arguments require little discussion. It is apparent from review of the promotional materials provided by AEL that the AEL master recording lease program was a tax shelter, having as its principal purpose the avoidance or evasion of Federal income tax. Our discussion of the absence of countervailing profit objective or economic substance reinforces this categorization. Thus the amount subject to the addition to tax may be reduced under section 6661(b)(1)(C) only if the taxpayer reasonably believed that the tax treatment of such

item by the taxpayer was more likely than not the proper treatment. Even the tax opinion of Blum did not suggest that the tax treatment claimed by AEL investors was more likely than not the proper treatment. The tax opinion was replete with cautions, as was Rhemann's advice to petitioner.

As is apparent from our comments about the lack of credibility to petitioner's claim of profit objective, we do not believe that this petitioner was acting in good faith. The objective facts indicating lack of economic substance and the warnings set forth in the promotional materials negate reasonable cause for the underpayment. See *Horn v. Commissioner*, 90 T.C. 908, 943-944 (1988). Petitioners are liable for the addition to tax under section 6661 for 1982. (The underpayment in issue for 1983 is not substantial within the meaning of section 6661.)

### *Section 6621(c)*

Section 6621(c) provides for interest at the rate of 120 percent of the normal rate (under section 6601) on underpayments with respect to any substantial underpayment attributable to tax-motivated transactions. The term "tax-motivated transaction" includes any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(v). A transaction, such as petitioner's transaction with AEL, that lacks economic substance or business purpose is a sham transaction under section 6621(c)(3)(A)(v). *Patin v. Commissioner*, 88 T.C. 1086, 1128-1129 (1987), affd. sub nom. without published opinion *Hatheway v. Commissioner*, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. without published opinion *Skeen v. Commissioner*, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion *Patin v. Commissioner*, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *Gomberg v. Commissioner*, 868 F.2d 865 (6th Cir. 1989).

Under section 6621(c)(3)(B):

(B) REGULATORY AUTHORITY.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account—

(i) the ratio of tax benefits to cash invested,
(ii) the methods of promoting the use of this type of transaction, and
(iii) other relevant considerations.

Under the authority delegated to him to designate by regulation other types of tax-motivated transactions, the Commissioner has promulgated temporary regulations, section 301.6621-2T, Q-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), including deductions disallowed for any period under section 183 (relating to an activity not engaged in for profit) among transactions deemed to be tax motivated. Under either of the above subparts of section 6621(c)(3), therefore, interest under section 6621(c) would be due on the portion of petitioners' underpayment attributable to the disallowed deductions, if that portion were substantial, i.e., exceeded $1,000. Sec. 6621(c)(2).

Section 6621(c)(3)(A)(i) categorizes "any valuation overstatement (within the meaning of section 6659(c))" as a tax-motivated transaction. In *Todd,* we discussed the relationship between section 6659(c) and section 6621(c) and the manner of calculating the amount of an underpayment that was "attributable to" a valuation overstatement. 89 T.C. at 917-918. As discussed above, in affirming our decision, the Court of Appeals for the Fifth Circuit adopted the formula, noting that it "instructs us to determine section 6659 liability '*after*' taking account of '*any* other proper adjustment to tax liability.' " 862 F.2d at 544. Application of that formula here compels the conclusion that the underpayment attributable to the conceded investment tax credit is not attributable to one of the tax-motivated transactions specified in section 6621(c). In this case the Commissioner's regulations specifically lead to the same result. Sec. 301.6621-2T, A-5, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). We recognize that the investment tax credit would have fallen with the contested deductions on alternative grounds (sham transaction, lack of profit objective). We believe, however, that the intended deterrent effect of sections 6659 and 6621(c) has been advanced by petitioner's concession, and reaching out further to penalize petitioners would be "too draconian."

See *Todd v. Commissioner,* 862 F.2d at 545 n. 15, quoted above.

Taxpayers should be cautioned, however, that a different situation exists where a valuation overstatement or other category of tax-motivated transaction is an integral part of or is inseparable from the ground found for disallowance of an item. *Irom v. Commissioner,* 866 F.2d 545 (2d Cir. 1989), revg. T.C. Memo. 1988-211; *Soriano v. Commissioner,* 90 T.C. at 60; *Barr v. Commissioner,* T.C. Memo. 1989-69; compare *Zirker v. Commissioner,* 87 T.C. at 980. In *Irom,* we granted cross-motions for summary judgment. We sustained respondent's determination that certain deductions were not allowable in accordance with requirements for advanced minimum royalty payments under section 1.612-3(b)(3), Income Tax Regs., because the alleged payment was by nonrecourse notes. We also granted petitioner's cross-motion for summary judgment as to additional interest under section 6621(c), concluding that the ground sustained for disallowance was not one of the categories of tax-motivated transactions there specified. The Court of Appeals for the Second Circuit reversed this holding and remanded the case for decision as to whether additional interest was warranted. The Court of Appeals distinguished *Todd* as follows:

In *Todd,* the Tax Court had found that a deficiency was not "attributable to" the taxpayer's overvaluation of his investment in refrigerated food containers because the containers were not placed in service during the relevant tax year. Thus, there was no permissible deduction that could have been overvalued. The disallowance of the deduction was independent of and wholly separable from the alleged overvaluation.

In contrast, the Tax Court here found that Irom's investment did not meet the requirements for advanced royalty payments because his financing was non-recourse. The finding of a deficiency on the royalty grounds thus appears to have been inseparable from a finding that the taxpayer was not "at risk" in the transaction.

The Fifth Circuit in *Todd* also relied on legislative materials suggesting that the amount of a deficiency "attributable to" an overvaluation should be calculated only after subtracting deficiencies based on other grounds. 862 F.2d at 541. A similar subtraction is warranted here if on remand the Tax Court finds that none, or only part, of Irom's deficiency is attributable to a transaction that was not "at risk." But if, as the Tax Court's opinion in this case suggests, the two grounds for deficiency are inseparable, then no subtraction is warranted. [*Irom v. Commissioner,* 866 F.2d at 547.]

Thus the Court of Appeals for the Second Circuit seems to have implicitly agreed with the application of the formula in *Todd* and in this case. Its distinction, however, should be observed in future cases where grounds for disallowing deductions or investment tax credits are inseparable and at least one such ground is a tax-motivated transaction.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, KÖRNER, SHIELDS, CLAPP, SWIFT, JACOBS, WRIGHT, WILLIAMS, WHALEN, and COLVIN, *JJ.*, agree with the majority opinion.

PARR and RUWE, *JJ.*, did not participate in the consideration of this opinion.

———————

GERBER, *J.*, dissenting: The majority opinion in this case and the opinion in *Todd v. Commissioner*, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988),[1] reach incorrect and anomalous results. The majority's conclusion is based upon a questionable and strained reading of the term "attributable to" and a similar misreading of the Joint Committee Explanation. These interpretations, while perhaps supportable in the abstract, ignore congressional focus upon gross overvaluation as one of the core problems of so-called "abusive tax shelters." Sections 6659 and 6621(c) were enacted to deter the very activity that the majority has circumvented and refused to address in its opinion.

The genesis of this controversy is our opinion in *Todd v. Commissioner, supra.* In an earlier Memorandum Opinion, *Noonan v. Commissioner*, T.C. Memo. 1986-449, we had made specific findings that the taxpayer's refrigerated containers had not been placed in service, resulting in the disallowance of all deductions and credits with respect to the container activity. In *Todd*, we concluded that the underpayment resulting from that disallowance could not be "attributable to" a valuation overstatement within the

———————

[1] Because an appeal from this case would normally proceed to the Court of Appeals for the Fifth Circuit, this dissent questions only the rationale underlying the result. See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

meaning of section 6659, notwithstanding the fact that the taxpayers had claimed values on their income tax returns for the containers exceeding 400 percent of fair market value.

This Court and the Court of Appeals for the Fifth Circuit found support for their reasoning in the following sentence in the Joint Committee on Taxation's General Explanation of the Economic Recovery Tax Act of 1981 (Blue Book). "The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability." From that sentence, both this Court and the Court of Appeals for the Fifth Circuit incorrectly reasoned that if another ground besides valuation overstatement supports a deficiency, the deficiency cannot be attributable to a valuation overstatement.

"Attributable" means capable of being attributed. *Irom v. Commissioner*, 866 F.2d 545 (2d Cir. 1989). In the ordinary meaning of that term, it is logical to conclude that an underpayment (the correct amount of tax less the amount shown on a timely return) may be attributable to more than one ground. The Court of Appeals for the Second Circuit is in agreement with this concept and in conflict with the Court of Appeals for the Fifth Circuit. "Thus, even though the Tax Court found a deficiency on the first ground, it should also have considered whether a deficiency was *capable of being attributed* to the second ground, which would have entailed additional interest." (Emphasis supplied.) *Irom v. Commissioner, supra* at 547. Although the Court of Appeals in *Irom v. Commissioner, supra* at 547, attempted to distinguish *Todd*, the Second Circuit's holding is based upon the opposite interpretation of the term "attributable." The Second Circuit held: "We do not think Congress intended to preclude additional interest for deficiencies that are *capable* of being attributed to tax-motivated transactions simply because the Commissioner seeks summary judgment for the deficiency on other grounds." *Irom v. Commissioner, supra* at 547. As a practical matter, the majority's rationale in this case would force respondent to pursue the tax-motivated transaction and/or overvaluation approach as the sole ground(s) for the

tax deficiency, although multiple grounds may exist, in order to successfully employ section 6621(c) or 6659.

Where, as here, the language of a statute is not expressly defined, legislative purpose can be found in the ordinary meaning of the words used. *Richards v. United States*, 369 U.S. 1, 9 (1962). The word "attributable" is defined as "capable of being attributed." Webster's Third New International Dictionary (1976). Congress enacted section 6659, along with a number of other penalty provisions (including sections 6621, 6661, and 6673) to deal with the Tax Court's backlog arising from the enormous number of tax shelter cases under audit, 500,000 of which involved property valuation questions of more than routine significance. In discussing these additions to tax, Congress believed it had "given the Tax Court sufficient tools to manage its docket * * * . The Court should * * * assert, without hesitancy in appropriate instances, the penalties that the Congress has provided." H. Rept. 98-861 (Conf.), 985 (1984), 1984-3 C.B. (Vol. 2) 1, 239. The majority's interpretation frustrates the policy that Congress sought to implement.

Initially, it should be noted that the so-called "Blue Book" commentary, heavily relied upon by the majority, is not considered part of the official legislative history underlying statutory enactment. Moreover, the majority's and the Fifth Circuit's reading of the Joint Committee (Blue Book post-enactment) Explanation is not the most plausible. The Blue Book contains the following sentence: "The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability." This sentence does not contemplate and was not intended to include situations where the deficiency related to a single transaction that could be sustained on multiple grounds. Rather, the sentence was intended to define or explain "attributable to" where there are several different portions of a deficiency, some admittedly attributable to a valuation overstatement and others not. The majority's reading of the Blue Book creates an unwarranted hierarchy where valuation overstatements are subordinated to every other ground for redetermining a deficiency. If anything, considering the

crux of the abusive shelter problem, we should give priority to grounds that support a valuation overstatement.

Valuation is one of the major devices used in abusive tax shelters. It is the value inherent in an asset that will imbue a transaction with economic substance. Value is the measure of the income producing potential of the asset, crucial to profit objective. In measuring profit objective, and economic substance, we look at the value of the underlying asset. *Rose v. Commissioner*, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), and cases cited therein.[2] The difference between abusive and nonabusive shelters is that the value of the assets are so grossly inflated as to remove any possibility of economic profit. "The fundamental issue in these cases generally will be whether the property has been 'acquired' at an artificially high price, having little relation to its fair market value." *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1046 n. 1 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Other inquiries in these cases, whether the asset will appreciate, whether the taxpayer obtained independent appraisals, the expertise of the taxpayer or his advisors, all relate to the taxpayer's realistic ability or honest attempts to measure value and, subsequently, earn a profit. Query whether petitioners would be before this Court had the value of the asset even approached the amount claimed?

The majority's position is ostensibly designed to obviate thorny and difficult valuation questions. Judicial economy should apply to situations where alternative grounds are available to support the same determination. Where, however, an alternative part of a deficiency determination can only be sustained if a further ground is considered, we must consider that ground because it is not an alternative. Even if the majority's approach were correct, it would not, in numerous circumstances, obviate the need to address the valuation issue. For example, one factor in determining whether a sale has occurred for tax purposes is the relationship of the purchase price to fair market value. *Grodt and McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981) (whether the taxpayer acquired an equity in the

---

[2] I agree with the majority concerning the continued viability of the *Rose* analysis as a sublimation of the voluminous case law concerning economic substance and profit objective.

property). Additionally, in both *Noonan v. Commissioner, supra* (predecessor to *Todd*), and in this case, the valuation problem was addressed, notwithstanding the Court's avowed hesitancy to do so.

It should be noted that the Court of Appeals for the Fifth Circuit implied in affirming *Todd* that deductions or credits disallowed for lack of profit objective would not create underpayments attributable to valuation overstatements. *Todd v. Commissioner,* 862 F.2d 540, 545 (5th Cir. 1988). The majority is correct in their holding that, at the least, if valuation is an integral part of or is inseparable from the ground found for disallowance, that the additions to tax (sections 6621(c) and 6659) should apply. *Irom v. Commissioner,* 866 F.2d 545 (2d Cir. 1989).

The logical path worn by the majority's reasoning will lead us to decide future cases on a basis other than valuation overstatement, where valuation is not the only focus or issue. We are not entitled to avoid ruling on an addition to tax simply because it involves further inquiry. The pervasive nature of the valuation inquiry militates against such an approach, since it could resolve many more issues at once—profit objective, economic substance, whether a note constitutes genuine indebtedness, and section 48(d) investment tax credit pass-through, etc. As previously indicated, given that value is one of the major focuses of the abusive tax shelter, resolution of that issue makes more sense than deciding a case on the basis of a side or collateral issue(s).

The rationale advanced by the majority will result in anomalous litigation tactics and results that are inconsistent with congressional intent. Taxpayers under the *Todd* rationale have the incentive to concede based on any amorphous ground other than a valuation overstatement or tax-motivated transaction. Similarly, in the charitable contribution context, we are encouraging concessions based on lack of donative intent. The majority's findings in this case reflect an egregious tax-motivated transaction. However, we are precluded from applying the additional interest section under the majority's reasoning, at the very least a violation of the spirit of the law. This is clearly an appropriate instance for application of section 6621(c), in a situation

intended by Congress. The majority's narrow definition of "attributable" thus leads to absurd results. This decision will result in taxpayers, who had claimed large credits and deductions based upon overvalued assets, arguing that their assets were not placed in service to avoid the congressionally intended additions to tax. Hence, a taxpayer with an asset placed in service will be more harshly treated than a taxpayer who claimed the same tax "benefits" where no asset existed or it was not placed in service.

The majority's attempt at a pragmatic solution will encourage taxpayers with no hope of prevailing to petition and concede the underlying deficiency based on a nontax-motivated issue, thus avoiding the additions. Moreover, the practical effect of the majority's opinion will be to shift focus from section 6659 to section 6661. For the number of cases already in the system, this will only generate mountains of paperwork as respondent rushes to amend his answer to alternatively plead section 6661. This may also have the effect of shifting the burden of proof to respondent in the most egregious valuation cases, because section 6661 may not have been included in the notice of deficiency (and afforded the presumption of correctness). As in this case, in lieu of a valuation, we will have to determine whether this is a statutory tax shelter. Sec. 6661(b)(2)(C). This entails determining whether the arrangement was one in which the principal purpose is to avoid or evade Federal income tax. The majority, in this case, determines that the transaction was a tax shelter lacking economic substance and profit objective, presumably by looking at the value, or the lack thereof, of the leased asset. "In view of his training as a loan officer, however, petitioner must have known that a non-negotiable note, payable only from gross receipts for 14 years, at 10-percent interest, did not reflect fair market value." Majority opinion at 847. Cf. *Goldstein v. Commissioner*, 89 T.C. 535 (1987). Therefore, valuation was considered by the majority even though they seem to seek avoidance of such consideration.

Where respondent determines an addition under section 6659, or section 6621(c), we are obliged to consider it, even if we are able to dispose of the underlying deficiency on an "easier" ground. Petitioners are responsible for an accurate

report of their tax to the Government, including the value of the master tapes. Perhaps they should have considered this before attempting to obtain $18,500 in tax benefits for an $11,000 investment. Therefore, I do not believe that the application of the sections 6621(c) and 6659 additions in this case would be either "draconian" or in any manner inequitable.