T.C. Memo. 1999-324


UNITED STATES TAX COURT


JOSEPH AND SUSAN L. FERRARO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2762-89.                     Filed September 27, 1999.


Joseph Ferraro, pro se.

John Mikalchus and Maureen O'Brien, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, Judge:  This case was assigned to Special Trial

Judge Robert N. Armen, Jr., pursuant to Rules 180, 181, and 183.[1]

---

[1] All Rule references are to the Tax Court Rules of
Practice and Procedure, and all section references are to the
Internal Revenue Code in effect for the taxable year in issue.
All amounts are rounded to the nearest dollar.

The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  Respondent determined a deficiency, additions to tax, and additional interest with respect to petitioners' Federal income tax for the taxable year 1981 in the amounts shown below:

| Deficiency | Additions to Tax Sec. 6653(a)(1)[1] | Additions to tax Sec. 6653(a)(2)[1] | Additions to tax Sec. 6659 | Additional Interest Sec. 6621(c) |
|---|---|---|---|---|
| $28,169 | $1,408 | [2] | $8,451 | [3] |

[1] The references in the notice of deficiency are to sec. 6653(a)(1)(A) and sec. 6653(a)(1)(B), respectively.  For the year in issue, the references should have been to sec. 6653(a)(1) and sec. 6653(a)(2), respectively.  However, there is no substantive difference between sec. 6653(a)(1) and sec. 6653(a)(1)(A) and between sec. 6653(a)(2) and sec. 6653(a)(1)(B).

[2] 50 percent of the portion of the underpayment that is attributable to negligence.

[3] Interest on the entire underpayment to be computed at 120 percent of the rate otherwise applicable under sec. 6621(a).

After a concession by petitioners,[2] the issues remaining for decision are as follows:

(1) Whether petitioners are entitled to a partnership loss deduction and investment and energy tax credits flowing from the Sentinel EPE recycler leasing program entered into by the Clearwater Group.  We hold that they are not.

(2) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations.  We hold that they are.

(3) Whether petitioners are liable for additional interest under section 6621(c).  We hold that they are.

                         FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.[3]  The stipulated facts and the attached exhibits are incorporated herein by this reference.  Petitioners resided in White Plains, New York, at the time that their petition was filed with the Court.

---

[2]  Petitioners concede that the Sentinel EPE recyclers that are involved in this case were overvalued.  Petitioners therefore also concede that they are liable for the addition to tax for overvaluation under sec. 6659 *if* we hold that they are liable for the underlying deficiency.

[3]  Petitioners objected to many of the stipulated facts on the ground of relevancy.  We have considered petitioners' objections, and they are overruled.

A.   The Recycling Transactions

This case is part of the Plastics Recycling group of cases. In particular, the deficiency, additions to tax, and additional interest arise from the disallowance of a partnership loss deduction and investment and energy tax credits claimed by petitioners with respect to petitioner husband's (petitioner) investment in a partnership known as the Clearwater Group (Clearwater). Clearwater was one of a large number of plastics recycling partnerships. On its 1981 partnership return, Clearwater listed licensing as its principal business and recycling equipment as its principal product.

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, and specifically Clearwater, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The transactions in this case are identical to the transactions discussed in Provizer as they involve the same partnership and the same Sentinel EPE recyclers that were involved in Provizer. Further, with the exception of certain facts that we regard as having minimal significance, petitioners have stipulated substantially the same facts concerning the underlying transactions that were described in Provizer. However, petitioners were not parties to Provizer and do not agree to be bound by the decision therein.

In a series of simultaneous transactions discussed in more detail in the Provizer case, Packaging Industries of Hyannis, Massachusetts (PI) manufactured and sold[4] six Sentinel EPE recyclers to ECI Corporation (ECI Corp.) for $981,000 each. PI manufactures thermoplastic and other types of packaging machinery, as well as energy saving devices. PI held itself out as one of the world's largest manufacturers of blister packaging machinery and fabricated a wide line of thermoforming machinery, including highly specialized disposable medical and food packaging systems. The Sentinel EPE recyclers were designed by PI to process low-density polyethylene foam scrap. The recycling process for polyethylene foam scrap consists of four steps and results in the formation of a milky-white uniform pellet of resin, but only if appropriate plastic scrap is collected and fed into the recyclers.

ECI Corp. in turn resold the Sentinel EPE recyclers to F&G Corporation (F&G Corp.) for $1,162,667 each. F&G Corp. then leased them to Clearwater, which licensed them to FMEC Corporation (FMEC Corp.), which sublicensed them back to PI.

---

[4] Terms such as "sale", "lease", and "license", as well as their derivatives, are used solely for convenience, and their use in this opinion should not be understood to imply that the transactions described herein constitute leases, sales, or licenses for Federal tax purposes.

Approximately 7 percent of the sale price of the Sentinel EPE recyclers sold by PI to ECI Corp. was paid in cash, with the balance financed through a 12-year nonrecourse note requiring equal monthly installments of $100,917, including annual interest of 19.8 percent. ECI Corp.'s purchase was subject to Clearwater's leasing agreement and FMEC Corp.'s licensing agreement.

Similarly, approximately 7 percent of the sale price of the Sentinel EPE recyclers sold by ECI Corp. to F&G Corp. was paid in cash, with the remainder financed through a 12-year, 90-percent nonrecourse note requiring equal monthly installments of $100,917, including annual interest at 15.4 percent. The 10-percent recourse portion of the note was payable only after the 90-percent nonrecourse portion was satisfied.

F&G Corp.'s purchase was subject to Clearwater's agreement to enter into a lease with F&G Corp. and was also subject to FMEC Corp.'s agreement to enter into a license agreement with Clearwater.

Clearwater's lease from F&G Corp. was for a term of 12 years, a lease term equal to 150 percent of the class life of the Sentinel EPE recyclers. The lease required monthly rental payments of $100,917.

Clearwater's license to FMEC Corp. was for a term of 12 years at a guaranteed minimum royalty of $100,917 per month.

After the Sentinel EPE recyclers were placed in service, the license required additional royalty payments based on a percentage of profits that might be realized on the sale or use of the resin pellets produced by the Sentinel EPE recyclers.

FMEC Corp.'s sublicense to PI, the manufacturer, was on a month-to-month basis for a royalty of $100,917 per month. The sublicense to PI was subject to most of the terms of the license from Clearwater to FMEC Corp.

No arm's-length negotiations for the price of the Sentinel EPE recyclers took place among PI, ECI Corp., F&G Corp., Clearwater, and FMEC Corp. All of the monthly payments required among the entities in the above transactions offset each other, and the transactions occurred simultaneously. For convenience, we refer to the series of transactions among PI, ECI Corp., F&G Corp., Clearwater, and FMEC Corp. as the Clearwater transactions.

PI allegedly sublicensed the Sentinel EPE recyclers to entities that would use the recyclers to recycle plastic scrap. These agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap. End- users were also required to use their best efforts to recycle 220 pounds per hour for 16 hours per week. Profits could then allegedly be made by lessees, such as Clearwater, in the form of royalties calculated as the sale price of the resin

pellets (or their fair market value if used by the sublicensee), less the sum of (1) the scrap recycling fee paid to converters (estimated at 15 cents per pound) and (2) an allowance to sublicensees for transporting and further processing the recycled material (also estimated at 15 cents per pound).

In addition to the Clearwater transactions, a number of other limited partnerships entered into transactions similar to the Clearwater transactions involving Sentinel EPE recyclers.

B.   Individuals Involved

Samuel L. Winer (Winer) is an investor, investment banker, and consultant.  Winer was the general partner of Clearwater and paid $1,000 for a 1-percent interest in all items of income, gain, deduction, loss, and credit arising from the operations of Clearwater.  For his services, Winer received $60,000 from the proceeds of the Clearwater private placement offering.

Richard Roberts (Roberts) was the general partner in a number of limited partnerships that leased Sentinel EPE recyclers.  Roberts was also a 9-percent shareholder in F&G Corp., the corporation that leased the recyclers to Clearwater.

From 1982 through 1985, Roberts and Raymond Grant (Grant) were in the business of promoting tax-sheltered investments. Grant was the president and 100-percent owner of ECI Corp. Roberts and Grant together were general partners in other partnerships.  Before the Clearwater transactions, Roberts and

Grant were clients of the accounting firm H.W. Freedman & Co. (Freedman & Co.).

Harris W. Freedman (Freedman), a certified public accountant and the name partner in Freedman & Co., was the president and chairman of the board of F&G Corp. Freedman was experienced with leveraged leasing, and he owned 94 percent of a Sentinel EPE recycler.

Freedman & Co. prepared the tax returns for ECI Corp., F&G Corp., and Clearwater. It also provided tax services to John D. Bambara (Bambara). Bambara was the 100-percent owner of FMEC Corp., as well as its president, treasurer, clerk, and director. Bambara was also the president of PI and a member of its board of directors. He, his wife, and his daughter also owned (directly or indirectly) 100 percent of the stock of PI. Bambara purchased one Sentinel EPE recycler.

Anthony Giovannone (Giovannone) was the executive vice president of PI and a member of its board of directors. Giovannone purchased a 15-percent interest in a Sentinel EPE recycler. Elliot I. Miller (Miller) was the corporate counsel to PI. In 1981, Miller was also a shareholder of F&G Corp.

John Y. Taggert (Taggert) was a well-known tax attorney and an adjunct professor at the New York University Law School. Taggert had been acquainted with Miller for about 15 years before 1981. Miller recommended that Roberts employ Taggert and his

firm as counsel. Taggert and other members of his firm prepared private offering memoranda, tax opinions, and other legal documents for Clearwater.

Robert Gottsegen (Gottsegen) was a businessman active in the plastics industry and a longtime business associate of Bambara.

C.    The Private Offering Memorandum

Clearwater distributed to potential limited partners a private offering memorandum. The offering memorandum informed investors that the business of Clearwater would be conducted in accordance with the six simultaneous transactions described above. The offering memorandum also listed significant business and tax risk factors associated with an investment in Clearwater.

Specifically, the offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service, and the purchase price paid by F&G Corp. to ECI Corp. would probably be challenged as being in excess of fair market value; (2) the partnership had no prior operating history; (3) the general partner had no prior experience in marketing recycling or similar equipment; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there was no established market for the Sentinel EPE recyclers; (6) there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin

pellets; and (7) certain potential conflicts of interest existed. In addition, the private offering memorandum included a provision stating:

The offer and sale of units is being made in reliance upon exemptions from registration under Federal and state securities laws. However, neither the Securities and Exchange Commission nor any other Federal or state government agency or self-regulatory body has approved or disapproved the securities offered hereby or passed upon the accuracy or adequacy of this memorandum.

The private offering memorandum for Clearwater also stated that each limited partner should have a minimum net worth (exclusive of his principal home, furnishings, and automobiles) in the amount of $200,000 per limited partnership unit. In addition, each partner was required to have enough income during 1981 to place the limited partner in at least the 50-percent income tax bracket. The private offering memorandum also stated that the projected tax benefits for the initial year of investment for an investor contributing $50,000 would be investment and energy tax credits in the aggregate amount of $86,328, plus partnership loss deductions in the amount of $39,399.

Reports by Samuel Z. Burstein (Burstein) and Stanley Ulanoff (Ulanoff), the "F&G evaluators", were included in the private offering memorandum. As indicated in their reports, neither Burstein nor Ulanoff was an expert in plastics or plastics

recycling, and both relied on information provided by PI and other parties related to the transaction in providing their reports. Both individuals were paid a fee each time their reports were included as part of a private offering memorandum of a plastics recycling partnership.

Burstein is a professor of mathematics at New York University. Burstein's report concluded that the Sentinel EPE recyclers were capable of continuous recycling. Ulanoff is a professor of marketing at Baruch College and has written numerous books on marketing subjects. His report covered the marketing value and potential of the Sentinel EPE recyclers and expressed the conclusion that the sale price paid by F&G Corp. for the recyclers was fair and reasonable. Ulanoff's report stated that his conclusions were based on his personal observation of the Sentinel EPE recycler prototype during a visit to PI, discussions with PI employees, the needs of the plastics industry, and his analysis of the economic projection provided in the offering memorandum.

The offering memorandum represented that the Sentinel EPE recyclers were unique machines. However, they were not. Several machines capable of densifying low-density materials were already on the market in 1981. Other plastics recycling machines available at that time ranged in price from $20,000 to $200,000, including the Foremost "Densilator", the Nelmor/Weiss

Densification System (Regenolux), the Buss-Condux Plastcompactor, and the Cumberland Granulator.  See Provizer v. Commissioner, T.C. Memo. 1992-177, and the discussion regarding expert testimony, infra.  At the time of the closing of the Clearwater transactions on December 21, 1981, there was no established market for leasing or operating the Sentinel EPE recyclers.

D.   Expert Testimony

Although petitioners conceded the overvaluation of the Sentinel EPE recyclers, the parties did not agree on the recyclers' value, and petitioners did not stipulate to be bound by the value of the recyclers that we found in Provizer.

At trial, petitioners did not offer expert testimony regarding the value of the Sentinel EPE recyclers.  In contrast, respondent offered expert testimony from Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom).

1.   Grossman

Grossman is a professor in the Plastics Engineering Department at the University of Massachusetts at Lowell.  He has a bachelor of science degree in chemistry from the University of Connecticut and a doctorate in polymer science and engineering from the University of Massachusetts.  He also has more than 15 years of experience in the plastics industry, including more than 4 years of experience as a research and development scientist at the Upjohn Company in its Polymer Research Group.

Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C., which practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's report concerning the value of the Sentinel EPE recycler discusses the limited market for the recycled plastics material. Grossman concluded that the Sentinel EPE recycler was unlikely to be a successful product because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any established market. Grossman suggested that a reasonable comparison of the products available in the polyethylene industry in 1981 with the Sentinel EPE recycler reveals that the Sentinel EPE recycler had very little commercial value and was similar to comparable products available on the market in component form. For these reasons, Grossman opined that the Sentinel EPE recycler did not justify the "one-of-a-kind" pricetag that it carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than, the Sentinel EPE recycler. These machines included: (1) The Buss-Condux Plastcompactor, available before 1981 for $75,000; (2) Foremost Machine Builders' "Densilator", available from 1978-81 for $20,000; and (3) the Midland Ross Extruder, available in 1980

and 1981 for $120,000.  Grossman observed that all of these machines were "widely available".

Grossman's opinion regarding the Sentinel EPE recycler was based on the descriptions of it in the writings of other professionals.  Grossman neither tested nor examined the Sentinel EPE recycler.

Grossman reported on the relationship between the plastics industry and the petrochemical industry.  Grossman noted that although the development of the petrochemical industry is a contributing factor in the growth of the plastics industry, the two industries have a "remarkable degree of independence".  Grossman observed that the "oil crisis" in 1973 triggered "dire" predictions about the future of plastics that had not been fulfilled in 1981.  Grossman stated that the cost of a plastic product depends, in large part, on technology and the price of alternative materials.  Grossman's studies concluded that a 300-percent increase in oil prices would result in a 30-40 percent increase in the cost of plastic.

Finally, Grossman reported that by 1981 the plastics industry had established that the success and value of any recycler was to be judged by the properties of the materials it produced.  The private offering memorandum failed to consider the resulting material properties of the plastics that were recycled by the operation of the Sentinel EPE recycler.  Grossman

concluded, therefore, that the applications and markets based on the recycled pellets were never seriously contemplated.

Grossman did not specifically value the Sentinel EPE recycler. However, as previously stated, Grossman concluded that existing technology provided equivalent capability for recycling polyethylene. Moreover, Grossman reported that information regarding the status of recycling in the plastics industry in 1981 was already well documented. Grossman reported further that an individual investor would have had little or no difficulty in confirming the invalidity of the claims in the private offering memorandum and, in particular, the claims of Ulanoff and Burstein suggesting that the Sentinel EPE recycler was unique.

2.   <u>Lindstrom</u>

Lindstrom graduated from the Massachusetts Institute of Technology with a bachelor's degree in chemical engineering. From 1956 until 1989, Lindstrom worked for Arthur D. Little, Inc., in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers. At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that in 1981 several different types of equipment capable of recycling expanded polyethylene were available and priced at approximately $50,000. Lindstrom found that, on the basis of his research, "there were

available in 1981 commercial units that could be purchased for $50,000 or less that were totally equal to the Sentinel EPE recycler in function, product quality, and capacity."

Lindstrom examined the Buss-Condux Plastcompactor and the Regenolux. Lindstrom found that these machines were functionally equivalent to the Sentinel EPE recycler and were available in the years and at the prices reported by Grossman, detailed supra. Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that in "average-use situations" the Sentinel EPE recycler could process 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPE recycler in operation at PI, and he was allowed to take photographs of it and examine its blueprints. Based on his observations and study, Lindstrom estimated that the manufacturing cost of the Sentinel EPE recycler was approximately $20,000. Lindstrom concluded that the market value of the Sentinel EPE recycler did not exceed $50,000.

Lindstrom also reported that information was available in 1981 regarding state-of-the-art foamed plastic recycling machines. Lindstrom described several approaches that might have

been taken by a layman of average intelligence to obtain such information, even in a small town library.

E.    Petitioner and His Introduction to Clearwater

Petitioner acquired one-fourth of a limited partnership unit in Clearwater in 1981 for $12,500.  As a result, petitioner owned a 1.547-percent interest in the profits, losses, and capital of Clearwater during that year.

Petitioner received a bachelor of arts degree in English literature from Fordham University in 1966 and a J.D. with honors from Harvard University in 1969.  Petitioner has no formal education in plastics recycling or plastics material.  During the year in issue, petitioner was a partner in the law firm of Shea & Gould.  During that year, petitioner wife was employed as a college instructor.

While in school, petitioner was employed during three summers by Consolidated Molded Plastics Company (Consolidated). Consolidated was in the business of making various industrial and consumer molded plastic products.  Petitioner was a machine operator and assisted in operating two types of molding machines; specifically, an injection-molding machine and a phenolic-molding machine.  During his summer employment, petitioner learned that both the injection-molding machine and the phenolic-molding machine produce plastic scrap as a byproduct.  Petitioner also learned that depending on the type of process used to mold the

plastic, the plastic scrap may or may not be recyclable. Finally, petitioner learned that certain plastic products could be made only from virgin plastic resins, whereas other products could be made from recycled plastic resins. Consolidated did not use expanded polyethylene foam in its operations.

Shortly after graduating from law school, petitioner represented the Society of the Plastics Industry (SPI) against the City of New York regarding the imposition of a 2-cent tax on every plastic container sold in the city. The New York Supreme Court held the tax provision to be unconstitutional and ultra vires to the city council, and the decision was affirmed by the New York Appellate Division. For a 10-year period starting in 1975, petitioner represented British Petroleum Company (BP) in an antitrust suit and a contract arbitration.

Petitioner became involved in Clearwater in 1981 after being introduced to Winer by Stuart Hirshfield (Hirshfield), a partner in his law firm. Hirshfield had previously invested in an equipment leasing transaction in which Winer was a general partner. Petitioner did not see a Sentinel EPE recycler before investing in Clearwater. Petitioner never made a profit in any year from his investment in Clearwater.

On their 1981 return, petitioners claimed a net Schedule E partnership loss of $10,002 from the Clearwater investment. Further, petitioners claimed investment and energy tax credits

from the Clearwater investment in the total amount of $22,303. The tax credits were based on valuing a Sentinel EPE recycler at $1,162,667. The Schedule E partnership loss and the investment and energy tax credits served to reduce petitioners' income tax liability on their 1981 return by $28,169, an amount more than twice their $12,500 investment in Clearwater.

In the notice of deficiency, respondent disallowed the Schedule E partnership loss and the investment and energy tax credits claimed by petitioners on their 1981 return with respect to the Clearwater investment.

ULTIMATE FINDING OF FACT

At all relevant times, the fair market value of the Sentinel EPE recyclers did not exceed $50,000 per machine.

OPINION

We have decided many Plastics Recycling cases. Most of these cases, like the present case, presented issues regarding additions to tax for negligence and valuation overstatement. See Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein). We found the taxpayers liable for the addition to tax for valuation overstatement in all of those cases and liable for the additions to tax for negligence in all but two of those cases. In a limited number of cases, the taxpayers also contested the

underlying deficiency arising from the disallowance of the partnership losses and various tax credits with respect to their plastics recycling investment.  We sustained the Commissioner on the issue of the underlying deficiency in every one of those cases.

In Provizer v. Commissioner, T.C. Memo. 1992-177, the test case for the Plastics Recycling group of cases, this Court:  (1) Found that each Sentinel EPE recycler had a fair market value not over $50,000; (2) held that the transaction, which was virtually identical to the transactions in the present case, was a sham because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers; and (5) held that the partnership losses and tax credits claimed with respect to Clearwater Group were attributable to tax-motivated transactions  within the meaning of section 6621(c).  In reaching the conclusion that the transaction lacked business purpose, this Court relied heavily on an objective criterion; namely, the overvaluation of the Sentinel EPE recyclers.

Issue 1.  The Underlying Deficiency for 1981

Petitioners contend that they are not liable for the underlying deficiency for 1981 with respect to their investment in Clearwater.  They assert that petitioner's investment in Clearwater and petitioner's professed belief that the Clearwater transactions were economically sound were not dependent on the valuation of the Sentinel EPE recyclers.  They contend that because of the offsetting structure of the transaction (under which Clearwater did not purchase the equipment but leased it, and under which Clearwater licensed the equipment to FMEC Corp. in exchange for a guaranteed annual royalty that was sufficient to pay the annual rent required of Clearwater) the gross overvaluation of the EPE recyclers was immaterial.  They conclude, therefore, that petitioner's investment in Clearwater was not an economic sham.

Petitioners also assert that given information available at the time of the transactions, i.e., without the benefit of hindsight, the Clearwater transactions were not an economic sham.

As already mentioned, petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra. Further, all of petitioners' contentions were addressed in Provizer, the test case for the Plastics Recycling group of cases.  Specifically, we considered whether, without the benefit

of hindsight, investment in Clearwater was an economic sham.  In deciding that the Clearwater transactions were an economic sham, we stated:  "We do not consider whether, in light of hindsight, the taxpayer made a wise investment, but rather whether he made any bona fide investment at all or merely purchased tax deductions."

We went on to consider in detail whether the taxpayer had made a bona fide investment in Clearwater, and we concluded that the transactions were a sham, lacking economic substance, in light of certain objective factors including:  (1) The manner in which the transactions were structured; (2) the lack of arm's-length dealings; and (3) the discrepancy between the fair market value and purchase price on which the pass-throughs were based.

In this case, there is a complete failure by petitioners to prove that the Clearwater transactions were not the circular transactions found to be an economic sham in Provizer. Petitioners have not established, or indeed attempted to establish, that any of the objective criteria considered in Provizer were in any manner different in their case.  Cf. McCrary v. Commissioner, 92 T.C. 827 (1989); Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989).  Neither have petitioners provided any further evidence or any novel

contention with respect to the underlying deficiency not previously considered in Provizer.[5]

The record in the present case regarding the Clearwater transactions plainly supports respondent's determination regarding the underlying deficiency. Petitioners have conceded overvaluation of the Sentinel EPE recyclers. The overvaluation of the Sentinel EPE recyclers was integral to our holding in Provizer, and the overvaluation in this case is inseparable from petitioners' claimed tax benefits. In fact, the overvaluation is the principal ground for the disallowance of petitioners' claimed tax benefits. Cf. McCrary v. Commissioner, supra at 859; Zenkel v. Commissioner, T.C. Memo. 1996-398.

We will therefore not revisit our decision in Provizer and reconsider whether the Plastics Recycling leasing program in which Clearwater participated was an economic sham. As in Provizer, we rely heavily on the fact that the Sentinel EPE recyclers were highly overvalued. On the basis of the same objective criteria and for the reasons discussed in detail in Provizer, we hold meritless the contention that the offsetting nature of the various steps of the Clearwater transactions made

_____

[5] As previously mentioned, for a detailed discussion of the facts and the applicable law in the substantially identical case, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993).

the investment economically sound as to petitioner.[6]  We
therefore sustain respondent's determination regarding the
underlying deficiency.

Issue 2.  Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioners are liable for
additions to tax under section 6653(a)(1) and (2) with respect to
the underpayment attributable to petitioners' investment in
Clearwater.  Respondent contends that it was not reasonable for
petitioner to invest in Clearwater without conducting an
independent investigation as to whether the transactions were an
economic sham, or more importantly, for petitioners to claim tax
benefits from such investment relying simply on the Clearwater
private offering memorandum.

---

[6]  Petitioners imply that we should adopt a subjective test,
i.e., consider factors listed in sec. 1.183-2(b), Income Tax
Regs., in deciding whether the Clearwater transactions were an
economic sham.  In this regard, petitioners contend that the
investment in Clearwater was made with a "reasonable objective"
of making a profit, thus negating the conclusion that the
Clearwater transactions were an economic sham.  We disagree.  On
the basis of the record in this case, the contention that
petitioner entered into the Clearwater transactions with a
reasonable objective of making a profit is meritless.  However,
in deciding whether the Clearwater transactions were an economic
sham, we find it unnecessary to discuss in any detail the factors
that lead us to conclude that petitioner did not invest in
Clearwater with the reasonable objective of making a profit.  Cf.
McCrary v. Commissioner, 92 T.C. 827 (1989).  For a discussion of
the professed reasonableness of petitioner's expectation of
making a profit from the Clearwater transactions, see Issue 2,
infra, where we decide whether petitioners are liable for the
additions to tax under sec. 6653(a)(1) and (2) for negligence or
intentional disregard of rules or regulations.

Petitioners have not alleged any facts to prove that petitioner conducted an independent investigation to determine whether the Clearwater transactions were an economic sham before investing in the partnership or before claiming tax benefits based on highly overvalued machinery. However, petitioners contend that in light of the totality of the circumstances, the limited nature of petitioner's investigation of the Clearwater investment and the claiming of tax benefits therefrom were reasonable. Petitioners refer to petitioner's summer employment at Consolidated and his representation of SPI and BP after graduation from law school. They conclude that in light of petitioner's background, it was reasonable to simply rely on the Clearwater private offering memorandum (and specifically on the reports of Burstein and Ulanoff) and on alleged discussions with Shea & Gould's tax partner.[7] We disagree. Rather, we hold that petitioner, a highly educated and sophisticated individual with a very limited background in plastics, failed to exercise the due care required under the circumstances of this case.

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is defined as the failure to exercise the due care that a reasonable

---

[7] See _infra_ note 8.

and ordinarily prudent person would exercise under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). In this regard, the determination of negligence is highly factual. "When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment." Turner v. Commissioner, T.C. Memo. 1995-363. Petitioners have the burden of proving error in respondent's determination of the additions to tax for negligence. See Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

A. Petitioner's Experience

We start with the contention that petitioner was not negligent because, on the basis of his summer employment at Consolidated and his representation of SPI and BP after graduating from law school, he reasonably expected to make a profit from the Clearwater investment. In this regard, petitioner claims that from personal experience, he appreciated the economic desirability of effective recycling equipment and

was knowledgeable about the supply and price movements of petroleum products. Based on these factors, petitioner claims that he reasonably expected to make a profit from his investment in Clearwater and was therefore not negligent.

We fail to see how petitioner's limited experience with plastics and plastics recycling, together with his professed knowledge about the desirability of "effective" recycling equipment, made it reasonable for him to invest in a partnership designed to produce tax benefits. Although petitioner's limited experience with plastics and plastic scrap, and his professed awareness about the economic desirability of effective recycling equipment, may have provided some motivation to consider the Clearwater investment, petitioner should have thereafter reasonably investigated his prospective investment.

There were many factors that should have alerted petitioner to conduct an independent investigation of the Clearwater investment. The transactions were structured in a manner such that, with the exception of a minimal downpayment for the Sentinel EPE recyclers, most of the purchase price was in the form of a series of offsetting payments realized only through bookkeeping entries. The purported price tags had nothing to do with traditional principles of supply and demand pricing because the Sentinel EPE recyclers were never offered on the open market, and there is no evidence that anyone ever intended to offer them

on the open market.  See <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177.  The lack of arm's-length negotiations in the open market and the exorbitant cost of each Sentinel EPE recycler, $1,162,667, should have caused petitioner to investigate the investment independently.

We have found that an independent investigation would have revealed the true nature of the Clearwater transactions as an economic sham.  Many factors were present to indicate that the Sentinel EPE recyclers were highly overvalued.  For instance, the Sentinel EPE recyclers were not unique.  Respondent's experts identified other machines that were not only functionally equivalent to the Sentinel EPE recyclers but were also significantly less expensive.  Information regarding comparable, less expensive recyclers was widely available.  If a potential purchaser, especially a sophisticated individual such as petitioner, had conducted a due diligence investigation of the Sentinel EPE recyclers, such a potential purchaser would have learned that comparable, less expensive equipment existed.  Such an investor would have concluded that the structure of the Clearwater transactions, set up to take advantage of tax benefits involving grossly overvalued equipment, constituted a sham.

In particular, petitioner was well positioned to recognize the Clearwater transactions as an economic sham.  Petitioner was a sophisticated and well-educated attorney.  Petitioner testified

that he was aware of the varying degrees of recyclability of plastic scrap depending on the process used by a manufacturer to mold plastic into a particular product. Petitioner was also aware of the varying qualities of resin pellets made from recycled plastic scrap depending on the "effectiveness" of the recycling equipment. Yet petitioner did very little to investigate his investment in a partnership formed to lease Sentinel EPE recyclers at the exorbitant cost of $1,162,667 each to ensure that they were in fact "effective" in producing marketable resin pellets. The record clearly indicates that if it were not for the promised tax benefits, a sophisticated individual such as petitioner would not have invested in a partnership that leased Sentinel EPE recyclers at 20 times their value. We are convinced that petitioner would not have invested in Clearwater were it not for the prospect of the sizable tax benefits that the investment in Clearwater offered.

Petitioners next present us with the so-called oil crisis argument. They assert that while representing BP, petitioner learned about the so-called oil crisis and the likelihood that the price of plastic would increase in future years because plastic is an oil derivative. According to petitioners, it was therefore reasonable to conclude that the Clearwater investment would be profitable.

Petitioners' so-called oil crisis argument has been made in more than 20 of the Plastics Recycling cases. See, e.g., Provizer v. Commissioner, supra; Merino v. Commissioner, T.C. Memo. 1997-385; Singer v. Commissioner, T.C. Memo. 1997-325; Sann v. Commissioner, T.C. Memo. 1997-259. We have found this argument to be unpersuasive in every one of those cases. Petitioners' argument is no different in any substantive manner, nor is their argument based on any legal authority not previously considered in those cases. We will not revisit the oil crisis argument. We therefore hold that the so-called oil crisis did not provide a reasonable basis for petitioners to conclude that the Clearwater investment would be profitable.

B. Reliance on the Private Offering Memorandum

We next address the contention that petitioner reasonably relied on the Clearwater private offering memorandum, and specifically on the reports of Burstein and Ulanoff, in making the Clearwater investment and claiming the tax benefits therefrom.[8]

---

[8] Petitioners also claim that petitioner relied on the advice of Shea & Gould's tax partner, Alan Parker (Parker). However, petitioners failed to present any evidence in this regard other than petitioner's own testimony. We do not find petitioner's self-serving testimony sufficient or particularly reliable in this regard. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995). Regardless, the record does not demonstrate: (1) Whether Parker
(continued...)

Under some circumstances, a taxpayer may avoid liability for negligence because of the taxpayer's reasonable reliance on a competent professional adviser. See <u>United States v. Boyle</u>, 469 U.S. 241, 250-251 (1985); <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). However, reliance on professional advice, standing alone, is not an absolute defense to negligence; rather it is a factor to be considered. See <u>Freytag v. Commissioner</u>, <u>supra</u>.

Petitioners claim that petitioner relied on representations by Burstein and Ulanoff regarding the uniqueness of the Sentinel EPE recyclers. However, petitioner did not independently obtain these individuals' advice but rather received their reports as part of the promotional material that he received from Clearwater. Burstein and Ulanoff were paid to promote the Plastics Recycling leasing programs and, in particular, the Clearwater investment. Reliance on representations by insiders,

---

[8](...continued)
possessed the requisite expertise and knowledge of the pertinent facts regarding the Clearwater transactions to provide informed advice on the claimed partnership losses and tax credits, see <u>David v. Commissioner</u>, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. per curiam T.C. Memo. 1993-621; <u>Goldman v. Commissioner</u>, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); or (2) what advice Parker rendered with respect to either the profitability of the transaction or the claiming of tax benefits therefrom, see also <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

promoters, or offering materials has been held to be an inadequate defense to negligence. See Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).

What is more, the record demonstrates that petitioner either did not thoroughly review the offering memorandum or chose to ignore certain portions thereof. The offering memorandum included numerous caveats and warnings regarding the business risks of the Clearwater transactions (including the general partner's lack of experience in marketing recycling or similar equipment and the lack of an established market for the recyclers) and the risks involved in claiming tax benefits therefrom. It also included a statement that "each offeree should consult his own professional advisors as to legal, tax, accounting and other matters relating to any purchase by him of units". Therefore, even the offering memorandum warned petitioner that he should not rely on Burstein or Ulanoff for either business or tax advice. A careful consideration of the offering memorandum, especially the discussion of high writeoffs and the risk of audit, would have alerted a prudent investor to question the nature of the promised tax benefits. We certainly

expect no less from a well-educated and sophisticated individual such as petitioner.

More importantly, it was not reasonable for petitioner to claim tax benefits from his investment in Clearwater on the basis of reliance on reports contained in the private offering memorandum. We have long held as a general rule that a taxpayer may not reasonably rely on the advice of the promoter of a tax shelter with respect to the substantive merits or the tax treatment of items in connection with that program. See Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. per curiam without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); Klieger v. Commissioner, T.C. Memo. 1992-734. Such advice "is better classified as sales promotion". Vojticek v. Commissioner, T.C. Memo. 1995-444.

Petitioners contend that it was reasonable for petitioner not to look beyond the offering memorandum but to accept its representations at face value because Federal and State securities laws discourage false or misleading statements. We find no merit in petitioners' argument.

First, in light of petitioner's educational background and professional experience, we are not convinced that he would have

been so naive if the Clearwater investment had not been driven by the promise of large tax benefits.  Second, there is no explanation why the many caveats and warnings regarding the tax and business risk factors detailed in the offering memorandum did not alert petitioner to investigate the Clearwater investment in more detail.  The Clearwater private offering memorandum contained cautionary language that was directed to the investor. Petitioners have presented no reason for us to doubt that the cautionary language meant what it said.

We therefore are not convinced of petitioner's professed faith in the representations in the offering memorandum, which was allegedly based on the concept that the securities laws discourage false and misleading statements.  Regardless of whether petitioners have a cause of action under Federal or State securities laws against Clearwater or any of its promoters, petitioners were not relieved of the duty to conduct an independent investigation of their investment before claiming tax benefits therefrom.  Under these circumstances, petitioner's failure to look beyond the private offering memorandum and the representations by Burstein and Ulanoff was unreasonable and not in keeping with the standard of the ordinarily prudent person. See Triemstra v. Commissioner, T.C. Memo. 1995-581; see also LaVerne v. Commissioner, supra; Marine v. Commissioner, 92 T.C.

958 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991).

Thus, it was not reasonable for petitioners to claim substantial tax credits and a partnership loss on the basis of reports contained in the Clearwater private offering memorandum; and, there is no indication that petitioners obtained professional advice from an individual with the requisite expertise and knowledge of the pertinent facts to provide informed advice regarding the claimed partnership loss and tax credits. Cf. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. per curiam T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994); Freytag v. Commissioner, 89 T.C. 849 (1987). Therefore, petitioners did not act reasonably in claiming tax benefits relating to the Clearwater investment.

C. Conclusion Regarding Negligence

In view of petitioner's sophistication, petitioner knew or should have known that the Sentinel EPE recyclers were not unique, that they were not worth more than $50,000 each, and that Clearwater lacked economic substance and had no potential for profit. Therefore, under the circumstances of this case, petitioners failed to exercise due care in claiming a partnership loss deduction and substantial tax credits with respect to Clearwater. Taking all of the above factors into consideration,

we think it is more likely than not that petitioner invested in Clearwater in an effort to generate tax benefits, rather than to make a profit.

Upon consideration of the entire record, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2).  Respondent is therefore sustained on this issue.

Issue 3.  Section 6621(c) Additional Interest

Respondent determined that petitioners are liable for additional interest with respect to the underpayment attributable to the Clearwater investment.

Section 6621(c), formerly section 6621(d), provides for an increased rate of interest if the underpayment of tax exceeds $1,000 and is attributable to a tax-motivated transaction as defined in section 6621(c)(3).  The increased rate of interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into before that date.  See Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986); Provizer v. Commissioner, T.C. Memo. 1992-177.

A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c).  See sec. 6621(c)(3)(A)(i).  Petitioners have conceded that there was such a valuation overstatement in the present case.  In addition, we

have held that the Clearwater transactions to which petitioners' 1981 underpayment is attributable were a sham.  A tax-motivated transaction includes any sham or fraudulent transaction.  See sec. 6621(c)(3)(A)(v); <u>Provizer v. Commissioner</u>, <u>supra</u>.  Finally, the grounds for the disallowance of petitioners' claimed tax benefits was largely the overvaluation of the Sentinel EPE recyclers.  Cf. <u>McCrary v. Commissioner</u>, 92 T.C. at 857-860. Under these circumstances, the increased rate of interest is therefore clearly applicable.  Accordingly, we sustain respondent on this issue.

Petitioners have made other arguments that we have considered in reaching our decision.  To the extent that we have not discussed these arguments, we find them to be without merit.

To reflect our disposition of the disputed issues, as well as petitioners' concession,

<u>Decision will be entered</u>

<u>for respondent</u>.